JOHN DOE, ON THE DEMISE OF LOT CLARK, DAVID CLARKSON, JOSEPH D. BEERS, ANDREW TALCOTT, BRANTZ MAYER, AND HARRIET HACKLEY, PLAINTIFF IN ERROR, *v.* JOSEPH ADDISON BRADEN.

In the ratification, by the King of Spain, of the treaty by which Florida was ceded to the United States, it was admitted that certain grants of land in Florida, amongst which was one to the Duke of Alagon, were annulled and declared void.

A written declaration, annexed to a treaty at the time of its ratification, is as obligatory as if the provision had been inserted in the body of the treaty itself.

Whether or not the King of Spain had power, according to the Constitution of Spain, to annul this grant, is a political and not a judicial question, and was decided when the treaty was made and ratified.

A deed made by the duke to a citizen of the United States, during the interval be-
tween the signature and ratification of the treaty, cannot be recognized as con-
veying any title whatever. The land remained under the jurisdiction of Spain
until the annulment of the grant.

THIS case came up, by writ of error, from the District Court
of the United States for the Northern District of Florida.

It was an ejectment brought by the lessee of Clark and the
other plaintiffs in error against Braden, to recover all that tract
or parcel of land in Florida, which is described as follows,
namely: Beginning at the mouth of the river heretofore called
or known as the Amanina, where it enters the sea, to wit, at the
point of the twenty-eighth degree and twenty-fifth minute of
north latitude, and running along the right bank of that river to
its head spring or main fountain source; thence by a right line
to the nearest point of the river St. John; then ascending said
river St. John, along its left bank, to the lake Macaco; then
from the most southern extremity of that lake, by a right line,
to the head of the river heretofore known or called the Hijuelas;
and then descending along that river's right bank to its mouth
in the sea; thence continuing along the coast of the sea, in-
cluding all the adjacent islands, to the mouth of the river Ama-
nina, the beginning point aforesaid, containing twelve millions
of acres of land.

The cause went on regularly by the appearance of the de-
fendant, the confession of lease, entry, and ouster, and the ad-
mission of counsel on behalf of the United States to defend the
suit.

In May, 1852, the case came up for trial at the city of St.
Augustine.

The counsel for the plaintiff offered in evidence the following
duly verified papers:

1. A memorial of the Duke of Alagon to the King of Spain,
dated 12th July, 1817, praying the king to be pleased to grant
him the uncultivated lands not already granted, in East Florida,
situated between the banks of the river Santa Lucia and San
Juan, as far as their mouths into the sea, and the coast of the
gulf of Florida and its adjacent islands, with the mouth of the
river Hijuelos by the twenty-sixth degree of latitude, following
along the left bank of said river up to its source, drawing thence
a line to lake Macaco, descending thence by the way of the
river San Juan to lake Valdez, and drawing another line from
the extreme north part of said latter lake to the source of the
river Amanina, thence pursuing the right bank of said river to
its mouth by the 28th or 25th degrees of latitude, and continuing
along the coast of the sea with all its adjacent islands, to the
mouth of the river Hijuelos, in full property for himself and his

Doe et al. *v.* Braden.

heirs, and permitting him the importation of negroes free of duty to work and cultivate said lands, a favor which he hopes to obtain from the innate benevolence of your Majesty, whose precious life may God preserve many years, as he prays.

MADRID, 12th July, 1817.

2. The order of the King upon the above, addressed to the royal and supreme council of the Indies, as follows:

His Majesty having taken cognizance of the contents therein, and in consideration of the distinguished merit of this individual, and of his well known zeal for the royal service, and likewise in consideration of the advantages which will result to the State by the increase of the population and civilization of the aforesaid territories, which he solicits, he has deigned to resolve, that the same be communicated to the supreme council, declaring to them that the favor which he solicits is granted to him, provided the same be not contrary to the laws; all of which I communicate to your Excellency by his royal order for your information and that of the council, and for the other necessary ends. God preserve your Excellency many years.

PALACE, December 17th, 1817.

3. A cedula, issued by the extinct council of the Indies, addressed to the governor, captain-general of the island of Cuba and its district, to the intendant of the army and royal exchequer of the Havana and its districts, and to the governor of the Florida. This document bore date on the 6th of February, 1818, and after reciting the petition and grant, concluded as follows:

Wherefore I command and require you, by this my royal cedula, that in conformity with the laws touching this matter, effectually to aid the execution of said gift, taking all the measures proper to carry it into effect without prejudice to the rights of a third party; and in order that the said Duke of Alagon may be enabled to put into execution his design, agreeably in every respect to my benevolent wishes, in furtherance of the agriculture and commerce of said possessions, which demand a population proportioned to the fertility of the soil and the defence and security of the coast, reporting hereafter successively the progress that may be made; it being understood that the importation of negroes, comprehended in said gift, is to be made, as far as the traffic in them is concerned, in conformity with the regulations prescribed in my royal order of the nineteenth of December ultimo, for such is my will; and that account be taken of this royal order in the contaduria-general of the Indies. Given at the palace, this sixth day of February, one thousand eight hundred and eighteen.

4. A power of attorney from the Duke of Alagon to Don Nicholas Garrido, dated 27th of February, 1818.

5. A decree of Coppinger, governor of Florida, dated 27th of June, 1818, putting Garrido into possession of the land claimed.

6. A deed of conveyance, dated 29th of May, 1819, from the Duke of Alagon to Richard S. Hackley, of Richmond, Virginia. This deed conveyed a part of the lands in question to Richard S. Hackley and company, for the purpose of immediately opening, clearing, and settling them.

7. The deposition of Ann Rachel Hart, of Baltimore, Maryland, that Richard S. Hackley was a native-born citizen of the United States.

8. A deed from Richard S. Hackley, dated 14th of September, 1836, to Joseph D. Beers, Lot Clark, and David Clarkson, the lessors of the plaintiff.

9. An admission by the counsel for the United States that Braden, the defendant, was in possession of $587\frac{45}{100}$ acres of land, lying on the Manatee river, in the present county of Hillsborough, which was covered by the foregoing titles, and was of the value of two thousand dollars and upwards.

The defendant, to prove the issue on his part, read in evidence certified copies of patents for his land from the United States.

A great number of other documents and testimony were offered by the defendant and plaintiff, but a particular notice of them is not deemed necessary in the present report.

On the conclusion of the argument, the court instructed the jury as follows:

1st. The foundation of the plaintiff's title is the concession or order of the King of Spain of the 17th of December, 1817, and the cedula or royal order of the 6th of February, 1818, which, together, constitute the grant or concession to the Duke of Alagon to the lands in question. Whether the order of the 17th of December, 1817, was complete in itself, and amounted to a grant, I deem it unimportant to inquire, because it was reaffirmed and made operative by the cedula or royal order of the 6th of February, 1818, which related back to the order of the 17th of December, 1817; and hence that may be considered the date of the concession, explained and rendered more full and perfect by the order of the 6th of February, 1818, and it is so considered for the purposes of this suit.

Taking these two orders together, it is manifest, from their tenor and spirit, and it is more particularly apparent from the orders and proceedings of the king and the council of the Indies, in the early part of 1818, that one object and intent, and one condition of the grant or concession to Alagon, and one of the principal inducements on the part of the king to make the

grant, was the colonization and settlement of the country, and the agricultural and commercial advantages which it was supposed would arise to the province therefrom. And it is equally clear that the grant was made subject to the laws of Spain, and particularly subject to such laws of the Indies as were applicable to the case; and that the Duke of Alagon, in his proceedings to carry into effect the objects of the grant, and to avail himself of its benefits, was bound to conform to those laws.

The testimony goes to show not only what those laws were, but that early in 1818, and before the Duke of Alagon had sold or conveyed any of these lands, his attention was distinctly called to them by the king and the council of the Indies, or by the proper officials of the Spanish government, and that every effort was made on the part of the King of Spain to insure the due observance of them by the Duke of Alagon; and that he was especially cautioned and advised that he could not by law, and would not be permitted to alienate the lands, or any part of them, particularly to strangers or foreigners. After this, and before any treaty had been ratified and confirmed between the United States and Spain, and while the province of East Florida was still under the dominion of Spain, and subject to the laws of Spain, the deed of May, 1819, was executed by Alagon to Richard S. Hackley.

Second. Therefore, if the jury are satisfied that the laws of Spain and the Indies were such as have been read to them, and that it was not lawful for a Spanish subject to sell or transfer lands to a stranger or foreigner, then this deed of May, 1819, from Alagon to Hackley, was in violation of law and void, and conferred no title upon Hackley.

The Duke of Alagon could not (if those laws have been correctly and satisfactorily proved) legally make any such conveyance; and had he attempted so to do here in the province of East Florida, where it ought to have been done if at all, he would have been prevented by the governor from doing it; and no notary here could have executed the papers without violation of law and of the royal order.

The same objection applies to the deed of conveyance to Hackley of the 30th of June, 1820. That conveyance was likewise in violation of law, and against the express injunctions of the king. It was made in Madrid instead of the province of East Florida, and while the Spanish law was in full force and effect here.

Third. The court is further of opinion, that the grant to the Duke of Alagon was in fact formally annulled by the king on the final ratification of the treaty, by and with the consent of the cortes, as appears from the evidence in the case; and

whether this revocation or annulment of the grant by the king and cortes was founded upon the fact that Alagon had justly forfeited all right to the lands by disregarding the objects and conditions of the grant, and by attempting to transfer the lands to a foreigner, or upon the right of eminent domain, and upon the ground that it was necessary, in order to complete the treaty, and therefore for the public good and general welfare of the nation, to resume or revoke the grant, it was in either case a rightful and legitimate use of sovereign power, and one which cannot be questioned in a court of justice.

Fourth. The court is further of the opinion, that even if the grant was not rightfully annulled by the treaty, yet it is not a grant which, by the terms of the treaty, would stand ratified and confirmed, or which the United States are bound to confirm, although made before the 24th of January, 1818: that the United States are bound to ratify and confirm it only to the same extent that it would have been valid if the territory had remained under the dominion of Spain; and it is manifest, from the evidence in the case, that if the treaty had not been made, the grant would not have been held valid by the Spanish government; it was in fact revoked and annulled by the king and cortes. The United States, therefore, are not bound either by the rules of public law, by the universal principles of right and justice, or by the terms of the eighth article of the treaty, to recognize or confirm it.

Fifth. The court is further of the opinion, that inasmuch as this claim under the grant to the Duke of Alagon has never been recognized and confirmed by the United States, or by any board of commissioners or court authorized by Congress to adjudicate or decide upon the validity of the grant, it is therefore a claim "not recognized or confirmed," and within the meaning of the first section of the act of Congress of 3d March, 1807, (relating to settlements, &c., on the public lands: 2d vol. Statutes at Large of the U. S. page 445,) and that the claimants, therefore, have only an equitable or inchoate title at best, and have not the right to take possession; but, on the contrary, are expressly forbidden so to do until their title has been confirmed. Consequently, that not having the right of possession, or the complete legal title, they cannot sustain an action of ejectment; that their only redress is by application to the political power or legislative department of the government; that the courts of justice cannot furnish it without a violation of law.

These points being fully conclusive as to the rights of the parties, the court deems it unnecessary to notice other points raised in the course of the trial and arguments.

Doe et al. *v.* Braden.

From these views of the court, however, the jury are bound to find a verdict for the defendant, and are so instructed accordingly.

To all of which charge, and each and every paragraph or section of the same, the plaintiffs' counsel excepted, and prayed their exception to be noted in the words following:

To all and every part of which instructions and directions, so far as adverse to the plaintiffs, the plaintiffs except, and especially to each and all of the directions and propositions and points contained in each of the articles or paragraphs of said instructions numbered, respectively, in the said instructions, 1, (one,) 2, (two,) 3, (three,) 4, (four,) and 5, (five.)

And the plaintiff prays the court to sign and seal this his bill of exceptions, which is accordingly done this twenty-fourth day of May, eighteen hundred and fifty-two.

(Signed) I. H. BRONSON, *Judge.* [SEAL.]

Upon this exception, the case came up to this court, and was argued by *Mr. Mayer*, and *Mr. Johnson* for the plaintiff in error, and by *Mr. Cushing* (Attorney-General) for the defendant.

*Mr. Mayer* prefaced his argument with a narrative, and inasmuch as a part of that historical narrative contained the foundation of one of his points, it is necessary to insert it, namely:

The royal order (constituting the grant to Alagon) of 17th December, 1817, declares that "His Majesty having taken cognizance of the contents, [of the petition of the duke,] and in consideration of the distinguished merit of this individual, and of his well-known zeal for the royal service, and likewise in consideration of the advantages which will result to the State by the increase of the population and civilization of the aforesaid territories which he solicits, he has deigned to resolve that the same be communicated to the supreme council, declaring to them that the favor which he solicits is granted to him, provided the same be not contrary to the laws." This order is addressed to the president of the council of the Indies.

It may be here remarked that when this order was passed, and for more than two years afterwards, the King of Spain was absolute monarch, the cortes for that period not existing; but at the ratification by him of the treaty the cortes had already been in renewed power for full seven months. Upon that ratification the sanction of the cortes was obtained for, and only for the 2d and 3d articles of the treaty, which yielded the Spanish territory; and it was asked because by the constitution the king could not alone alienate any part of the Spanish territory, nor any national property, but for the alienation needed the consent of the cortes. Constitution, title 4, c. 1, art. 172,

54 *

§§ 4, 7. Describing the king as a constitutional monarch, we further may advert to the 10th section of the same article of the constitution; that declaring that "he shall not take the property of any person or corporation, nor hinder or impede the free possession, use, and benefit thereof," — and the same section proceeds to prescribe that " if at any time it shall be necessary for an object of acknowledged public utility to take the property of an individual; nevertheless, it shall not be done, unless he be at the same time indemnified and a fair equivalent be given him upon a sufficient inquiry made by fit and proper men."

The ancient laws of Spain on the general rights of property have always been authoritative as if constitutional rules; and, upholding the sanctity of private property against the royal encroachment, the Laws of Spain and the Indies, Book 3, tit. 5, Law 1, ordain that " those things which the king gives to any one cannot be taken from him either by the king or any one else without some fault of his; and he to whom they are given shall dispose of them at his will, as of any other thing belonging to him.

The points made by *Mr. Mayer*, were the following:

1. The royal acts (the order of 17th December, 1817, upon the duke's petition of the preceding July, and the cedula or missive to the captain-general of Cuba of 6th February, 1818,) constitute a grant, and an assurance of the legal estate in the lands, and taking date from the 17th December, 1817. That being the effective date of the grant, it is not affected by the 3th article of the treaty with Spain, which condemns only grants of date after the 24th January, 1818. The grant was consummated by all the formal possessions that it can be pretended the Spanish law demanded; and the possessory ceremony was by that law authorized through an attorney, on this occasion Garrido, whose conferred powers are fully testified. Moreover, this attorney was empowered to sell and settle and improve the granted lands in execution of the purpose declared by the duke's petition as his view in asking the grant. And the action of Garrido in this latter branch of his agency (shown in the testimony of the defendant himself) proves all diligence and *bona fides* in fulfilling what the petition indicated as the grantee's design. All in that respect was done that could within the brief period have been exacted, assuming the expression of purpose by the petitioner to have the effect, when shown to have induced the grant, to make the grant conditional, and that even precedently so. But the grant was not under a condition, either precedent or subsequent. The declaration of purpose in the petition for a grant from Spain, when the grant itself does not, upon that declaration, introduce it as a condition in terms,

is not, as this court has determined, to be treated as a condition of any kind. The crown shows its content with the general assurance offered by the grantee, and rests upon his good faith; and so implies by not converting the general pledge or promise into terms of condition. If, however, a condition (for settling and improving the land) is to be implied, it can be but a condition subsequent, and, agreeably to this court's adjudication, the fulfilment of the duty was prevented, and therefore excused, by the succeeding and so early transfer of the sovereignty of the region from Spain to the United States. And when a grant is conditional, and the condition has been performed, or has ceased to bind, the grant is deemed absolute *ab initio.*

(*Mr. Mayer* then proceeded to show, by reference to authorities, that the grant was founded on sufficient consideration.)

II. The deed of Alagon to Hackley bears date the 29th of May, 1819, and, so, after the ratification by the United States of the treaty with Spain. The treaty was ratified anew by our government after Spain's ratification, and was reratified merely because it was necessary to waive the limitation of six months specified in the treaty for the exchange of ratifications. It was the original treaty, bearing date the 22d of February, 1819, that was ratified. The proprietary rights of the United States took date from the date of the treaty, and, on the consummate ratification, related to that period. No control of Spain is to be deemed to have rested in her after the treaty's date over the territories of Florida as a domain, or for any purpose of legislation, or of administration, referable to her interest, or within her polity, municipal or foreign. The validity of that deed, as to Hackley's capacity, being a foreigner, to take it was, consequently, beyond any regulation of Spain, no matter how ancient, save only contingently, in the event of the treaty not being definitely ratified.

III. This treaty with Spain in the consideration of the 8th article, and of the clauses of territorial cession, has been by the Supreme Court always determined to design no departure from the great principle of civilized justice, and of modern international law, that in no transfer of a territory can any domain be passed or be accepted from the ceding nation than what belongs to the government — the public property. That property alone, and the sovereignty of the transferred region, are the only legitimate objects of such international transactions, and the sovereignty is to be esteemed the primary object. The court has said that the express terms of this treaty deferring to private rights, were not needed for thus limiting the treaty's scope; and the 8th article is not to be regarded as enlarging the cession of property. In other words that article, even as to grants sub-

sequent to 24th of January, 1818, must be construed in subserviency to the sanctity that our own public law accords to the rights of contract and private property. 8 Peters, 445, 449, 450; Aredondo's Case, 6 Ib. 735, 736; Percheman's Case, 7 Ib. 86; 9 Ib. 133, 169, 170; 14 Ib. 349; 8 Howard, 306, 307; Terrett v. Taylor, 9 Cranch, 43.

These cases affirm, too, the reformed doctrine of international law, that even by conquest the lands of individuals shall not be wrested from them, and in no respect are to be yielded even to the rights of war. Much less are they, then, to be conceded to the exactions of diplomatic bargaining. We may add to these authorities (not now adverting to all the treatises on international law where they enjoin the same doctrine) 1 Pet. 517; 12 Ib. 410, 511; 8 Wheat 464; 4 Ib. 518; 4 Cranch, 323; Fletcher v. Peck, 6 Ib. 87; Wheat. Nat. Law 269, b. 2, ch. § 16. All real property taken in war is entitled to postliminy.

IV. These views, under our third head, lead to the conclusion that no grants of Spain, in her Florida region, of portions already conceded to individuals, could be asked to be annulled; or could be accepted by our government from Spain, if even her king had had despotic power to thus despoil without redress — (which immunity and irremediableness of wrong defines despotic government) — except only where the individual interest could be shown to have expired from default justly imputable, and going to the forfeiture of the rights. Such a default would be the failure to fulfil conditions of the grants. It will be seen, that in the correspondence of our government prior to the treaty, and in the expostulations that followed our ratification of it throughout the negotiation, which the executive, unprompted by the Senate's counsel or instructions, and so without full warrant, we might say, embarked in, the vacating of grants of Spain actually made, (no matter of what extent,) was not claimed save upon the ground of their conditions having been violated, or having failed to be fulfilled. The gratuitous character of grants was not made the plea; and as little was, or could the area of the grants be the pretext; in both particulars the sovereignty of Spain giving her absolute discretion, and her policy, already adverted to, placing her liberality beyond suspicion in these territorial appropriations. Consistently then with what was assumed as the only basis of the pretension, as well as looking to the only grounds that could find shelter in the pure public law of the era, no grants could under the treaty have been designed for denunciation, except those that were extinct for violation of their conditions. Let the expository terms used by the king in his ratification be deemed then more than what it merely is, (and it is merely the expression of an opinion, and a

comment on the treaty text,) and let it be dignified, or aggravated, as a decree of forfeiture or of confiscation, and yet it must be interpreted relatively to the grounds 'upon which we, or rather the executive, claimed the annulment to be just, and not as if we demanded it as a royal despotic assumption. It is well to remark here, (as bearing on the idea that may be urged that Spain yielded the sacrifice of the Alagon grant, under a pressure, as dire as if under belligerent durance,) that the instructions to our minister at Madrid, which our quotations on this head embrace, show that the exaction of the annulment was meant to be experimental, and that the terms were not to be insisted on if the Spanish government were found impracticable when remonstrated with. It will be perceived by the court that Don Onis, the Spanish Minister here, in his communication to our Secretary did,— true to the principle that the annulment of no grants was to be arbitrary, and that no absolute power was assumed thus to reside in the Spanish crown,— declared that if he had even known that the grant to Alagon (and the other obnoxious grants) bore date before the 24th of January, 1818, he would not have assented to their being declared void — that is, merely on an assumption of a particular date, for sweeping nullification, careless of the infirmity or the vigor of the grantee's rights or pretensions.

That the ratification of our government, which took place immediately on the signature of the treaty, was regarded as definitive, and not as contingent upon any expansion (by Rider or by royal rescript or opinion) of the terms of the treaty, is evident from the fact which the succeeding correspondence and instructions show, that the immediate occupation of the ceded territory was claimed under the auspices of the treaty. In the testimony of our opponents, we have in the case the Executive Journal of the Senate, relative to the treaty already referred to by us, showing the original and very prompt ratification by us of the treaty, and so giving its due weight and peculiar character to the diplomatic movement following the ratification. Beside the passages mentioned of the Senate Executive Journal, we refer, with regard to the positions just submitted, to the following portions of the " State Papers," in the 4th volume, pp. 465, 509, 532, 627, 652, 653, 658, 659, 669, 683, 684, 687, 689.

With this grant, then, no condition having been violated and no default to inflict forfeiture having occurred, it follows that the claim of Mr. Hackley could not have become void within the actual meaning of the parties to the treaty, even giving to the king's declaratory ratification the extreme office of a decree of 'annulment, and supposing that his prerogative gave him power for such action.

V. It cannot be said that the annulment may be justified upon imputable fraud of Spain, assuming even that the grant was made after, instead, as is the fact, of being made before, (and of pending before the king more than six months) the period of proposing the cession; more than a year elapsing further before the treaty was concluded. Under the theory of that imputation, the king's special ratification would be a concession of the fraud, and a decree not only against the grant, but against the honor of the crown. Fraud is not ascribable to a sovereign State, in her compacts with other powers; and particularly not as to a subject of concession, over which her dominion was legally absolute until that subject actually, by her own act, the result of her own pleasure, were severed from her possessions.

This court has deemed the supreme right of disposal in the Spanish crown, or in any government having power to alienate the domain of the State, too positive and absolute to allow complaint of any act within that power, no matter even how reasonable it be to infer that it was in anticipation of a surrender of sovereignty of the region, and designed to lessen the public domain of the succeeding sovereign. United States *v.* Clarke, 8 Peters, 463. That decision in effect affirms that fraud is not to be inferred, nor is chargeable against any act of a sovereign power, if merely it be coördinate with the sovereign legal rights and control. 15 Peters, 595; 11 Wheat. 359; 7 Cranch, 130.

VI. The grant could not have been amended by the right of eminent domain residing in the king. The constitution of Spain declares, art. 172, tit. 4, c. 1, § 10, that the king "shall not take the property of any person or corporation, nor hinder or impede the free possession, use, and benefit thereof, and if at any time it shall be necessary for an object of acknowledged public utility to take the property of an individual, nevertheless it shall not be done unless he be at the same time indemnified, and a fair equivalent be given him upon a sufficient inquiry made by fit and proper men." No indemnification is pretended to have been here at any time provided for this deprivation of property, and no establishment of the necessity, nor of the object of "public utility" is testified from the only appropriate arbiter, the legislative authority of Spain, composed of cortes as well as king, in which legislature resided the representative sovereignty of Spain. This determination of the urgency of the object for which the private property is to be granted by this eminent domain, is by all political law assigned to the sovereignty. It is emphatically so appropriated by the Spanish constitution. Art. 3, tit. 1, c. 1, declares that "the sovereignty

resides essentially in the nation," and by art. 15, tit. 2, c. 3, the legislative power belongs to the cortes together with the king."

VII. Thus showing the limitation of the royal power and how special, and narrowed was, as shown even by the king's act of ratification, the action of the cortes as to the cession, and how that action, allowing only public estate to be ceded and excluding from cession private property, did, in effect, contradict the king's surrender (if his act be so construed) of the lands of Alagon and make his provisions in his ratification repugnant to the act and will of his constitutional partners in the sovereignty of Spain. What effect can be assigned to that ratification in its denunciation of the grant to the duke? Recurring to the constitutional inhibitions upon the king's interference with private property, quoted under the preceding heads, and to the ancient laws we have cited, of equal obligation, we are at a loss to apprehend where, in himself, and in clear contradiction of the view, and even the determination of the cortes, there can be found a warrant for his repudiation of the grant, regarding now his act as a decree of annulment or of confiscation? Divorced from the public domain, for all power of alienation, by the positive interdict of the constitution, and forbidden, beside, by the superadded terms of the constitution from alienating "any portion of the Spanish territory," "however small," and whether public or private, and these limitations of prerogative and respect for private property solemnly consecrated by the king's oath; and, again, art. 4 of the constitution declaring that "the nation is bound to maintain and protect by wise and equitable laws the civil liberty, property, and other legal rights of the individuals who compose it," it seems only necessary to show that the constitution of Spain was in force when this ratification occurred, to have the king's condemnation of our grant dismissed as a mere nullity. But it pretends not to be a decree or ordinance annulling the grant. It takes the treaty as a text, and appends, by making the denunciation, only a version of the treaty itself, or records testimony as to an "understanding," that by the very treaty has failed to be carried out, and whose basis the eighth article of the treaty shows to be erroneous. Viewed as an opinion, (however it be a royal emanation,) it can have no effect. As testimony to explain, or rather to prevail in contradicting the treaty, it must likewise be unavailing. The declaration could legitimately serve but one purpose and as a memorial of fact; and that is to found a claim by the United States against Spain for indemnification, for parting with property which she taught the United States to believe would pass to her in the general cession of territory.

We deny that even the king and cortes, in combined legislative action, or under any title of power, could have annulled the grant. And we are in that aspect of the case independent of the testimony, given by our adversary, that the grant was not annulled by concurrence of the cortes, and that the king's act had in no respect their sanction. The Spanish constitution vests no such power in the cortes and king even united to confiscate private property, unless indeed it were admissible under the prerogative of "eminent domain," an interpretation which we have shown to be here inapplicable. Can it be pretended that the king alone, divorced as he was from the power to alienate any portion of the public domain, and, more than that, any "portion of the Spanish territory," or interfere with private property, whether in the title to it or the use of it, could effect that by his decree, which, if legitimately practicable at all by the state, could be effected by only the sovereignty of the country, and that formed of the cortes and himself?

7 Cranch, 134, 136. There this court defines legislative power; and denounces as alien to it, and as despotic, all pretension by a legislative authority to annul private rights, especially without compensation.

But we refer, as conclusive against the power to annul, in king, or in king and cortes, to the effect of the treaty's relation to its date, as stated at page 31 hereof.

VIII. Conceding to the ratification the character of a decree and the king's constitutional power to pass it, can the United States accept the land thus taken arbitrarily from an individual and enjoy the sacrifice of private rights? If under other circumstances it could be accepted, can it be after all that has transpired in relation to this grant, and especially after our ratifying this treaty — before this American citizen, Mr. Hackley, received his conveyance — without then intimating a complaint, much less interposing a protest, against the grant to Alagon — but lulling the world into the impression that private property was to be held sacred, and that (whatever might have been the suggestions, hostile to it, in course of the negotiation) the grant of Alagon was, by the limitation of date proclaimed in the treaty, left inviolate and committed to its intrinsic merits?

Our principles of public law reject the proffer of such an addition to the treaty domain; and by that law, as we recognize it under our peculiar political institutions, this case and the force of the king's act of confiscation are to be judged. If we cannot, because contrary to those principles, sanction the right to have decreed this regal spoil, how can the right to it be enforced by the United States, and, if so, how then can any pretension be effective as a defence founded on such a supposed right?

Story's Confl. L. §§ 244, 326, and the cases there cited; 15 Pet. 595; 1 Gallis. Rep. 375; Fletcher *v.* Peck, 7 Cranch, 132, 133, 135.

If this view be true generally, as to all contracts and pretensions of foreign source, repugnant to our maxims of political and social justice, it applies here most conclusively to this case of a native American citizen, as Mr. Hackley is proved to have been. 7 Cranch, 138, 139. He was protected by the Constitution of the United States, and (as the Supreme Court, in the case cited, says) " by the general principles common to our free institutions."

IX. It has been assumed by us that this is not a case for political action of our government, but for the judicial power directly. This, in the case of our complete grant, since the cases of Perchman, in 7 Peters, and of Aredondo, in 6 Peters, and of United States *v.* Wiggins, 14 Pet. 349, is unquestionable. Nor have we made any remarks as to the sufficiency of authentication of our documentary testimony; that being in our opinion unnecessary after the decision by this court on that head. Among those decisions we may refer to 14 Pet. 345, 346.

*Mr. Cushing* (Attorney-General) rested his case upon the following point:

That the annulment of the grant to the Duke of Alagon, declared by the treaty of cession of the Floridas, is binding and absolutely conclusive upon all the departments of the government and upon the people of the United States.

By the Constitution of the United States, the political power of making treaties is vested in the President of the United States by and with the advice and consent of the Senate, (art. 2, § 2.)

" And all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land." Art. 6, para. 2.

Hence it follows that the treaty of cession of the Floridas, having been duly ratified, proclaimed, and published in the statute book, operates of itself, in respect of these three annulled grants, as a supreme law.

The Congress of the United States passed the act of the 3d of March, 1821, to carry into execution the treaty between the United States and Spain, concluded at Washington on the 22d day of February, 1819, (3 Stat. at Large, by Little & Brown, 637, c. 39.) The first section authorized the President to take possession of and occupy the " territories of East and West Florida and the appendages and appurtenances thereof; and to transport the officers and soldiers of the King of Spain, being

there, *to* the Havana, agreeably to the stipulations of the treaty between the United States and Spain, concluded at Washington on the 22d day of February, in the year 1819, providing for the cession of said territories to the United States." The same act organized a territorial government, and extended the laws of the United States for collection of the revenue, and prohibiting the importation of persons of color over the said ceded territories.

The legislative and the executive departments of the United States government, in the exercise of their political powers, and his Catholic Majesty, in the exercise of his political power, have explicitly annulled the grant to the Duke of Alagon.

The explanation of the 8th article, so made before the ratifications of the treaty, upon which explanation the treaty was accepted and ratified by the President and Senate of the United States, and upon which explanation the ratifications were exchanged between the two contracting powers, is as much a part of the eighth article, and as much a part of the treaty, as any other of the articles.

That explanation and express annulment of the grant to the Duke of Alagon, so affected by the political powers of the government of the United States, is binding upon, and to be followed by, the judicial department. Foster & Elam *v.* Neilson, 2 Peters, 307, 309, 312, 313; Garcia *v.* Lee, 12 Peters, 516, 517, 518, 519, 521; United States *v.* Reynes, 9 Howard, 153, 154.

These three cases were decided upon the cession by Spain to the United States of the Floridas; the private claims asserted in those cases were granted by Spain after the treaty of San Ildefonso, of 1800, after the cession of Louisiana to the United States by the treaty of Paris of 1803, and before the 24th of January, 1818. They were located between the rivers Iberville and Perdido, in the parish of Feliciana, within the disputed limits between Louisiana and West Florida, which had been repeatedly discussed, with talent and research, by the governments of the United States and Spain.

The private claimants insisted —

1st. Upon the right of Spain to the disputed territory, and invoked the decision of this court upon the true construction of the treaty of San Ildefonso, of the 1st of October, 1800, by which Spain retroceded Louisiana to France, and of the treaty of Paris of 30th of April, 1803, by which France ceded Louisiana to the United States.

2d. That their claims, granted by Spain before the 24th of January, 1818, were expressly confirmed by the first member of the eighth article of the treaty of 1819, for the cession of the Floridas to the United States.

3d. That the explanatory clause, contained in the ratification of the treaty, forms a part of the eighth article, and that the article so explained should be understood as if it had been written thus: " All the grants of land made before the 24th of January, 1818, by his Catholic Majesty, or his lawful authorities in the said territories, ceded by his Majesty to the United States, except those made to the Duke of Alagon, the Count of Puñonrostro, and Don Pedro de Vargas, shall be ratified and confirmed, &c."

To the first position, this court answered, (2 Peters, 307,) " The judiciary is not that department of the government to which the assertion of its interests against foreign powers is confided, and its duty commonly is to decide upon individual rights according to those principles which the political departments of the nation have established. If the course of the nation has been a plain one, its courts would hesitate to pronounce it erroneous.

" We think then, however individual judges might construe the treaty of San Ildefonso, it is the province of the court to conform its decisions to the will of the legislature, if that will has been clearly expressed."

The court then cited the acts of Congress showing that the United States had, before the ratification of the treaty for the cession of the Floridas, distinctly declared that the boundary of Louisiana, as acquired under the treaties of San Ildefonso, of 1800, and of Paris of 1803, extended east as far as to the river Perdido — had taken actual possession of territory according to such declaration of the boundary of Louisiana as acquired by the treaties of San Ildefonso, of 1800, and of Paris, of 1803 — and had annexed a part of the disputed territory to the State of Louisiana. Whereupon this court said, (2 Peters, 209,) " If those departments which are intrusted with the foreign intercourse of the nation, which assert and maintain its interests against foreign powers, have unequivocally asserted its rights of dominion over a country of which it is in possession, and which it claims under a treaty; if the legislature has acted on the construction thus asserted, it is not in our own courts that this construction is to be denied. A question like this, respecting the boundaries of nations, is, as has been truly said, more a political than a legal question, and in its discussion the courts of every country must respect the pronounced will of the legislature."

To the second position, this court answered, (2 Peters, 310, 311,) That his Catholic Majesty, by the second article of the treaty, ceded to the United States " all the territories which belong to him," situated to the eastward of the river Mississippi,

known by the name of East and West Florida; that the words
" which belong to him," limit the extent of the cession; that
the United States cannot be considered as admitting by this
article that the territory which, at the signature of the treaty,
composed a part of the State of Louisiana, rightfully belonged
to his Catholic Majesty; that these terms were probably selected
so as not to compromit the dignity of either government, and
which each might understand consistently with its former pre-
tensions; that the sixth article, stipulating for incorporating the
inhabitants of the ceded territories into the Union of the United
States, is coextensive with the cession, and did not include the
territory which was then a part of the State of Louisiana, which
was already a member of the American confederacy; that the
eighth article of the treaty must be understood as limited to
grants made by his Catholic Majesty within the ceded territory,
that is, within "the territories which belong to him."

To the third proposition this court answered, (2 Peters, 312,)
" But an explanation of the eighth article has been given by the
parties which (it is supposed) may vary this construction. It
was discovered that three large grants, which had been supposed
at the signature of the treaty to have been made subsequent to
the 24th of January, 1818, bore a date anterior to that period.
Considering these grants as fraudulent, the United States in-
sisted on an express declaration annulling them. This demand
was resisted by Spain; and the ratification of the treaty was
for some time suspended. At length his Catholic Majesty
yielded, and the following clause was introduced into his ratifi-
cation: ' Desirous at the same time of avoiding any doubt or
ambiguity concerning the meaning of the eighth article of the
treaty,' &c., (quoting the residue of the king's ratification.)
One of these grants, that to Vargas, lies west of the Perdido.

" It has been argued, and with great force, that this explana-
tion forms a part of the article. It may be considered as if in-
troduced into it as a proviso or exception to the stipulation in
favor of grants anterior to the 24th January, 1818."

" . . . . . . These three large grants being made about the
same time, under circumstances strongly indicative of unfairness,
and two of them lying east of the Perdido," (and the third also
being as to a part east of the Perdido,) might be objected to on
the ground of fraud common to them all; without implying any
opinion that one of them, which was for lands lying within the
United States, and most probably sold by the government, could
have been otherwise confirmed. The government might well
insist on closing all controversy relating to these grants, which
might so materially interfere with its own rights and policy in
its future disposition of the ceded lands, and not allow them to

become the subject of judicial investigation; while other grants, though deemed by it to be invalid, might be left to the ordinary course of the law. . . . . .

"An extreme solicitude to provide against injury or inconvenience, from the known existence of such large grants, by, insisting upon a declaration of their absolute nullity, can, in their opinion, furnish no satisfactory proof that the government meant to recognize the small grants as valid, which in every previous act and struggle it had proclaimed to be void, as being for lands within the American territory."

The principles so adjudged in 1829, in Foster & Elam *v.* Neilson, were affirmed in Garcia *v.* Lee, in 1838, and again in 1850, in United States *v.* Reynes, before cited.

The treaty ceding the Floridas to the United States, as explained in the ratification, expressly annuls the grants to the Duke of Alagon, the Count of Puñonrostro, and Don Pedro de Vargas; — in this express declaration and understanding, it was accepted and ratified by the President and Senate of the United States; in this sense the ratifications were exchanged between the two contracting nations; in this understanding the Congress passed various statutes, whereof only two need be particularly noticed here. The first is "An act for ascertaining claims and titles to land within the territory of Florida," approved 8th May, 1822, (3 Stat. at Large by Little & Brown, p. 709, c. 129,) the fourth section of which alludes to the claims rejected by the treaty, and excepts them from the powers of the commissioners, as herein before quoted. The other is "An act supplementary to the several acts providing for the settlement and confirmation of private land claims in Florida," approved 23d May, 1828, (4 Stat. at Large by Little & Brown, 284,) the sixth section whereof authorized claimants to lands in Florida, not decided and finally settled under the provisions of this act, &c., to present their cases by petition to the judiciary, to try the validity of their claims: "Provided, that nothing in this section contained shall be construed to authorize said judges to take cognizance of any claim annulled by the said treaty, or the decree ratifying the same by the King of Spain, nor any claim not presented to the commissioners, or register and receiver, in conformity to the several acts of Congress, providing for the settlement of private land claims in Florida."

The explanation of the 8th article of the treaty, so made and contained in the ratifications as exchanged between the two governments, forms a part of the 8th article.

In that the legislative, the executive, and the judicial departments of the United States have hitherto concurred.

The grants by his Catholic Majesty to the Duke of Alagon,

55 *

the Count of Puñonrostro, and Don Pedro de Vargas, are annulled by the treaty.

The plaintiff, in ejectment, produces, in evidence, this annulled Spanish grant to the Duke of Alagon as the foundation of his title to the land demanded, as the fulcrum of his action against the adverse possessor.

Upon the plaintiff's own evidence, upon his showing of the facts, the supreme law of the land pronounces that he has no title, no just cause of action.

All subsequent and subsidiary questions are vain.

Mr. Chief Justice TANEY delivered the opinion of the court.

This controversy has arisen out of the treaty with Spain by which Florida was ceded to the United States.

The suit is brought by the plaintiff in error against the defendant to recover certain lands in the State of Florida. It is an action of ejectment. And the plaintiff claims title under a grant from the King of Spain to the Duke of Alagon. This is the foundation of his title. And if this grant is null and void by the laws of the United States, the action cannot be maintained.

The treaty in question was negotiated at Washington, by Mr. Adams, then Secretary of State, and Don Louis De Onis, the Spanish Minister. It was signed on the 22d of February, 1819; and by its terms the ratifications were to be exchanged within six months from its date.

It appears, from the treaty, that the negotiations commenced on the 24th of January, 1818, by a proposition from the Spanish government to cede the Floridas to the United States. The grant to the Duke of Alagon bears date February 6th, in the same year, and consequently was made after the King of Spain had authorized his minister to negotiate a treaty for the cession of the territory, and after the negotiation had actually commenced. It embraces ten or twelve millions of acres.

The fact that this grant had been made came to the knowledge of the secretary, pending the negotiation; and he also learned that two other grants — one to the Count of Puñonrostro, and the other to Don Pedro de Vargas, each containing some millions of acres, had also been made under like circumstances. These three grants covered all or nearly all of the public domain in the territory proposed to be ceded. And the secretary naturally and justly considered that grants of this description made while the negotiation was pending, and without the knowledge or consent of the United States, were acts of bad faith on the part of Spain, and would be highly injurious to the interests of the United States, if Florida became a part of

their territory. For the possession and ownership of such vast tracts of country by three individuals would be altogether inconsistent with the principles and policy on which this government is founded. It would have greatly retarded its settlement, and diminished its value to the citizens of the United States. For no one could have become a landholder in this new territory without the permission of these individuals, and upon such conditions and at such prices as they might choose to exact.

Acting upon these considerations, the secretary insisted that if the negotiations resulted in a treaty of cession, an article should be inserted by which these three grants, and any others made under similar circumstances, should be annulled by the Spanish government.

The demand was so obviously just, and the conduct of Spain in this respect so evidently indefensible, that after much hesitation it was acceded to, and the 8th article introduced into the treaty to accomplish the object. By this article " all grants made since the 24th of January, 1818, when the first proposal on the part of his Catholic Majesty for the cession of the Floridas was made, are thereby declared and agreed to be null and void;" and all grants made before that day, are confirmed.

With this provision in it, the treaty was submitted to the Senate, who advised and consented to its ratification on the 24th of February, 1819, and it was accordingly ratified by the President.

Before, however, the ratifications were exchanged, the Secretary of State was informed that the Duke of Alagon intended to rely on a roy [1] order, of December 17, 1817, (which is recited in the grant hereinbefore mentioned,) as sufficient to convey to him the land from that date; and upon that ground claimed that his title was confirmed and not annulled by the treaty.

The secretary, it appears, was satisfied that this royal order conveyed no interest to the Duke of Alagon; and that the grant in the sense in which that word is used in the treaty, was not made until the instrument, dated the 6th of February, 1818, was executed.

But as a claim of this character, however unfounded, would cast a cloud upon the proprietary title of the United States, and as claims might also be set up under similar pretexts under the grants to the Count of Puñonrostro and Vargas, the secretary deemed it his duty to place the matter beyond all controversy before the ratifications were exchanged. He therefore requested and received from Don Louis de Onis a written admission that these three grants were understood by both of them to have been annulled by the 8th article of the treaty; and that it was nego-

tiated and signed under that mutual understanding between. the negotiatòrs. And having obtained this admission, he notified the Spanish minister that he would present a declaration to that effect, upon the exchange of ratifications, and expect a similar one from the Spanish government to be annexed to the treaty.

But the King of Spain for a long time refused to make the declaration required, or to ratify the treaty with the declaration of the American government attached to it. And a great deal of irritating correspondence upon the subject took place between the two governments. Finally, however, the King of Spain ratified it on the 21st of October, 1820, and admitted, in his written ratification annexed to the treaty, in explicit terms, that it was the positive understanding of the negotiators on both sides when the treaty was signed, that these three grants were thereby annulled; and declared also that they had remained and did remain entirely annulled and invalid; and that neither of the three individuals mentioned, nor those who might have title or interest through them, could avail themselves of the grants at any time or in any manner.

With this ratification attached to the treaty, it was again submitted by the President to the Senate, who on the 19th February, 1821, advised and consented to its ratification. It was ratified, accordingly, by the President, and the ratifications exchanged on the 22d of February, 1821. And Florida, on that day, became a part of the territory of the United States, under and according to the stipulations of treaty — the rights of the United States relating back to the day on which it was signed

We have made this statement in relation to the negotiations and correspondence between the two governments for the purpose of showing the circumstances which occasioned the intro·duction of the 8th article, confirming Spanish grants made before the 24th of January, 1818, and annulling those made afterwards; and also for. the purpose of showing how it happened that the three large grants by name were declared to be annulled in the ratification, and not by a stipulation in the body of the treaty. But the statement is in no other respect material. For it is too plain for argument that where one of the parties to a treaty, at the time of its ratification annexes a written declaration explaining ambiguous language in the instrument or adding a new and distinct stipulation, and the treaty is afterwards ratified by the other party with the declaration attached to it, and the ratifications duly exchanged — the declaration thus annexed is a part of the treaty and as binding and obligatory as if it were inserted in the body of the instrument. The intention of the parties is to be gathered from the whole instrument, as it stood when the ratifications were exchanged.

It is not material, therefore, to inquire whether the title of the Duke of Alagon takes date from the royal order of December 17th, 1817, or from the grant subsequently made on the 6th of February, 1818. In either case the treaty by name declares it to be annulled.

It is said, however, that the King of Spain, by the constitution under which he was then acting and administering ⸝the government, had not the power to annul it by treaty or otherwise; that if the power existed anywhere in the Spanish government it resided in the cortes; and that it does not appear, in the ratification, that it was annulled by that body or by its authority or consent.

But these are political questions and not judicial. They belong exclusively to the political department of the government.

By the Constitution of the United States, the President has the power, by and with the advice and consent of the Senate, to make treaties provided two thirds of the Senators present concur. And he is authorized to appoint ambassadors, other public ministers and consuls, and to receive them from foreign nations; and is thereby enabled to obtain accurate information of the political condition of the nation with which he treats; who exercises over it the powers of sovereignty, and under what limitations; and how far the party who ratifies the treaty is authorized, by its form of government, to bind the nation and persons and things within its territory and dominion, by treaty stipulations. And the Constitution declares that all treaties made under the authority of the United States shall be the supreme law of the land.

The treaty is therefore a law made by the proper authority, and the courts of justice have no right to annul or disregard any of its provisions, unless they violate the Constitution of the United States. It is their duty to interpret it and administer it' according to its terms. And it would be impossible for the executive department of the government to conduct our foreign relations with any advantage to the country, and fulfil the duties which the Constitution has imposed upon it, if every court in the country was authorized to inquire and decide whether the person who ratified the treaty on behalf of a foreign nation had the power, by its constitution and laws, to make the engagements into which he entered.

In this case the King of Spain has by the treaty stipulated that the grant to the Duke of Alagon, previously made by him, had been and remained annulled, and that neither the Duke of Alagon nor any person claiming under him could avail himself of this grant. It was for the President and Senate to determine whether the king, by the constitution and laws of Spain, was

authorized to make this stipulation and to ratify a treaty containing it. They have recognized his power by accepting this stipulation as a part of the compact, and ratifying the treaty which contains it. The constituted and legitimate authority of the United States, therefore, has acquired and received this land as public property. In that character it became a part of the United States, and subject to and governed by their laws. And as the treaty is by the constitution the supreme law, and that law declared it public domain when it came to the possession of the United States, the courts of justice are bound so to regard it and treat it, and cannot sanction any title not derived from the United States.

Nor can the plaintiff's claim be supported unless he can maintain that a court of justice may inquire whether the President and Senate were not mistaken as to the authority of the Spanish monarch in this respect; or knowingly sanctioned an act of injustice committed by him upon an individual in violation of the laws of Spain. But it is evident that such a proposition can find no support in the Constitution of the United States; nor in the jurisprudence of any country where the judicial and political powers are separated and placed in different hands. Certainly no judicial tribunal in the United States ever claimed it, or supposed it possessed it.

The plaintiff seems to suppose that he has a stronger title than that of the Duke of Alagon. It is alleged that the Duke of Alagon, on the 29th of May, 1819, conveyed the greater part of the land granted to him by the King of Spain to Richard S. Hackley, a citizen of the United States. This deed to Hackley was after the signature of the treaty and before the exchange of ratifications, and the plaintiff claims through Hackley, and contends that this American citizenship protected his title.

But if the deed from the Duke of Alagon to a citizen of the United States was valid by the laws of Spain, and vested the Spanish title in Hackley; yet the land in his hands remained subject to the Spanish law and the authority and power of the Spanish government as fully as if it had continued the property of the original grantee. Hackley derived no title from the United States, nor were his rights in the land, if he had any, regulated by the laws of the United States, nor under their protection. It was a part of the territory of Spain, and in her possession and under her government, until the ratifications of the treaty were exchanged. And until that time the rights of the individual owner, and the extent of authority which the government might lawfully exercise over it, depended altogether upon the laws of Spain. And whatever rights he may have had under the deed of the Duke of Alagon, they were extinguished by the

Doe et al. *v.* Braden.

government from which he held them while the land remained a part of its territory and subject to its laws. It was public domain when it came to the possession of the United States, and he had then no rights in it.

In this view of the case it is not necessary to examine the other questions which appear in the exception or have been raised in the argument. The treaty is the supreme law, and the stipulations in it dispose of the case. The judgment of the District Court must therefore be affirmed.

## *Order.*

This cause came on to be heard on the transcript of the record from the District Court of the United States for the Northern District of Florida, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court that the judgment of the said District Court in this cause be, and the same is hereby affirmed, with costs.