Justice Breyer,
dissenting.
I join Part I of Justice Sotomayor’s opinion. As she points out, Baker v. Carr, 369 U. S. 186 (1962), set forth several categories of legal questions that the Court had previously held to be “political questions” inappropriate for judicial determination. Those categories include (1) instances in which the Constitution clearly commits decision-making power to another branch of Government, and (2) issues lacking judicially manageable standards for resolution. Id., at 217. They also include (3) issues that courts cannot decide without making “an initial policy determination of a kind clearly for nonjudicial discretion,” (4) issues that a court cannot independently decide “without expressing lack of the respect due coordinate branches of government,” (5) cases in which there is “an unusual need for unquestioning adherence to a political decision already made,” and (6) cases in which there is a potential for “embarrassment from multifarious pronouncements by various departments on one question.” Ibid.
As Justice Sotomayor also points out, these categories (and in my view particularly the last four) embody “circumstances in which prudence may counsel against a court’s resolution of an issue presented.” Ante, at 204 (opinion concurring in part and concurring in judgment); see Nixon v. United States, 506 U. S. 224, 253 (1993) (Souter, J., concurring in judgment) (the political-question doctrine “deriv[es] in large part from prudential concerns about the respect we owe the political departments”); Goldwater v. Carter, 444 U. S. 996, 1000 (1979) (Powell, J., concurring in judgment) *213 (“[T]he political-question doctrine rests in part on prudential concerns calling for mutual respect among the three branches of Government”); see also Jaffe, Standing To Secure Judicial Review: Public Actions, 74 Harv. L. Rev. 1265, 1304 (1961) (prudence counsels hesitation where a legal issue is “felt to be so closely related to a complex of decisions not within the court’s jurisdiction that its resolution by the court would either be poor in itself or would jeopardize sound decisions in the larger complex”).
Justice Sotomayor adds that the circumstances in which these prudential considerations lead the Court not to decide a case otherwise properly before it are rare. Ante, at 207. I agree. But in my view we nonetheless have before us such a case. Pour sets of prudential considerations, taken together, lead me to that conclusion.
First, the issue before us arises in the field of foreign affairs. (Indeed, the statutory provision before us is a subsection of a section that concerns the relation between Jerusalem and the State of Israel. See § 214 of the Foreign Relations Authorization Act, Fiscal Year 2003,116 Stat. 1365 (“United States Policy with Respect to Jerusalem as the Capital of Israel”).) The Constitution primarily delegates the foreign affairs powers “to the political departments of the government, Executive and Legislative,” not to the Judiciary. Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp., 333 U. S. 103, 111 (1948); see also Marburg v. Madison, 1 Cranch 137, 166 (1803) (noting discretionary foreign affairs functions of Secretary of State as beyond the power of the Judiciary to review). And that fact is not surprising. Decisionmaking in this area typically is highly political. It is “delicate” and “complex.” Chicago & Southern Air Lines, 333 U. S., at 111. It often rests upon information readily available to the Executive Branch and to the intelligence committees of Congress, but not readily available to the courts. Ibid. It frequently is highly dependent upon what Justice Jackson called “prophecy.” Ibid. And *214 the creation of wise foreign policy typically lies well beyond the experience or professional capacity of a judge. Ibid. At the same time, where foreign affairs is at issue, the practical need for the United States to speak “with one voice and ac[t] as one” is particularly important. See United States v. Pink, 315 U. S. 203, 242 (1942) (Frankfurter, J., concurring); see also R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler’s The Federal Courts and the Federal System 240 (6th ed. 2009).
The result is a judicial hesitancy to make decisions that have significant foreign policy implications, as reflected in the fact that many of the cases in which the Court has invoked the political-question doctrine have arisen in this area, e. g., cases in which the validity of a treaty depended upon the partner state’s constitutional authority, Doe v. Braden, 16 How. 635, 657 (1854), or upon its continuing existence, Terlinden v. Ames, 184 U. S. 270, 285 (1902); cases concerning the existence of foreign states, governments, belligerents, and insurgents, Oetjen v. Central Leather Co., 246 U. S. 297, 302 (1918); United States v. Klintock, 5 Wheat. 144, 149 (1820); United States v. Palmer, 3 Wheat. 610, 634-635 (1818); and cases concerning the territorial boundaries of foreign states, Williams v. Suffolk Ins. Co., 13 Pet. 415, 420 (1839); Foster v. Neilson, 2 Pet. 253, 307 (1829). See Baker, supra, at 211-213 (citing these cases as the Court’s principal foreign-relations political-question cases); see also Fallon, supra, at 243-247.
Second, if the courts must answer the constitutional question before us, they may well have to evaluate the foreign policy implications of foreign policy decisions. The constitutional question focuses upon a statutory provision, § 214(d), that says: The Secretary of State, upon the request of a U. S. citizen born in Jerusalem (or upon the request of the citizen’s legal guardian), shall “record” in the citizen’s passport or consular birth report “the place of birth as Israel.” 116 Stat. 1366. And the question is whether this statute uncon *215 stitutionally seeks to limit the President’s inherent constitutional authority to make certain kinds of foreign policy decisions. See American Ins. Assn. v. Garamendi, 539 U. S. 396, 414-415 (2003) (citing cases); Clinton v. City of New York, 524 U. S. 417, 445 (1998) (“[T]his Court has recognized that in the foreign affairs arena, the President has ‘a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved’” (quoting United States v. Curtiss-Wright Export Corp., 299 U. S. 304, 320 (1936))); cf. Youngstown Sheet & Tube Co. v. Sawyer, 343 U. S. 579, 637-638 (1952) (Jackson, J., concurring).
The Secretary of State argues that the President’s'constitutional authority to determine foreign policy includes the power to recognize foreign governments, that this Court has long recognized that the latter power belongs to the President exclusively, that the power includes the power to determine claims over disputed territory as well as the policy governing recognition decisions, and that the statute unconstitutionally limits the President’s exclusive authority to exercise these powers. See U. S. Const., Art. II, §2, cl. 2; Art. II, § 3; e. g., Kennett v. Chambers, 14 How. 38, 50-51 (1852). (recognition); Williams, supra, at 420 (disputed territory); Pink, supra, at 229 (recognition policy); see also Haig v. Agee, 453 U. S. 280, 293 (1981) (executive passport authority).
Zivotofsky, supported by several Members of Congress, points out that the Constitution also grants Congress powers related to foreign affairs, such as the powers to declare war, to regulate foreign commerce, and to regulate naturalization. See Art. I, §.8, els. 3, 4, 11; see also American Ins. Assn., supra, at 414. They add that Congress may share some of the recognition power and its attendant power of determining claims over disputed territory. E. g., Palmer, supra, at 634 (recognition); Jones v. United States, 137 U. S. 202, 212 (1890) (disputed territory). And they add that Congress *216 may enact laws concerning travel into this country and concerning the citizenship of children born abroad to U. S. citizens. See Henderson v. Mayor of New York, 92 U. S. 259, 270-271 (1876) (travel); Fong Yue Ting v. United States, 149 U. S. 698, 714 (1893) (immigration); United States v. Wong Kim Ark, 169 U. S. 649, 688 (1898) (citizenship). They argue that these powers include the power to specify the content of a passport (or consular birth report). And when such a specification takes the form of statutory law, they say, the Constitution requires the President (through the Secretary of State) to execute that statute. See Art. II, § 3.
Were the statutory provision undisputedly concerned only with purely administrative matters (or were its enforcement undisputedly to involve only major foreign policy matters), judicial efforts to answer the constitutional question might not involve judges in trying to answer questions of foreign policy. But in the Middle East, administrative matters can have implications that extend far beyond the purely administrative. Political reactions in that region can prove uncertain. And in that context it may well turn out that resolution of the constitutional argument will require a court to decide how far the statute, in practice, reaches beyond the purely administrative, determining not only whether but also the extent to which enforcement will interfere with the President’s ability to make significant recognition-related foreign policy decisions.
Certainly the parties argue as if that were so. Zivotofsky, for example, argues that replacing “Jerusalem” on his passport with “Israel” will have no serious foreign policy significance. See Brief for Petitioner 43, 46-52; Reply Brief for Petitioner 25-26. And in support he points to (1) a State Department official’s statement that birthplace designation serves primarily as “an element of identification,” while omitting mention of recognition; (2) the fact that the State Department has recorded births in unrecognized territories in the region, such as the Gaza Strip and the West Bank, *217 apparently without adverse effect; and (3) the fact that sometimes Jerusalem does (because of what the Government calls “clerical errors”) carry with it the name of “Israel” on certain official documents, again apparently without seriously adverse effect. See Brief for Petitioner 7-10, 15, 43, 50; App. 50, 58-60, 75-76. Moreover, Zivotofsky says, it is unfair to allow the 100,000 or so Americans born in cities that the United States recognizes as under Israeli sovereignty, such as Tel Aviv or Haifa, the right to a record that mentions Israel, while denying that privilege to the 50,000 or so Americans born in Jerusalem. See Brief for Petitioner 18-20, 48-49; App. 48.
At the same time, the Secretary argues that listing Israel on the passports (and consular birth reports) of Americans born in Jerusalem will have significantly adverse foreign policy effects. See Brief for Respondent 8,37-41. She says that doing so would represent “'an official decision by the United States to begin to treat Jerusalem as a city located within Israel/” id., at 38-39, that it “would be interpreted as an official act of recognizing Jerusalem as being under Israeli sovereignty,” App. 56, and that our “national security interests” consequently “would be significantly harmed,” id., at 49. Such an action, she says, “ ‘would signal, symbolically or concretely, that’” the United States “‘recognizes that Jerusalem is a city that is located within the sovereign territory of Israel/” and doing so “‘would critically compromise the ability of the United States to work with Israelis, Palestinians and others in the region to farther the peace process.’ ” Brief for Respondent 2; App. 52-53. She adds that the very enactment of this statutory provision in 2002 produced headlines in the Middle East stating that “the U. S. now recognizes Jerusalem as Israel’s capital.” Id., at 231; Brief for Respondent 10; see also App. 53-55, 227-231.
A judge’s ability to evaluate opposing claims of this kind is minimal. At the same time, a judicial effort to do so risks inadvertently jeopardizing sound foreign policy decision- *218 making by the other branches of Government. How, for example, is this Court to determine whether, or the extent to which, the continuation of the adjudication that it now orders will itself have a foreign policy effect?
Third, the countervailing interests in obtaining judicial resolution of the constitutional determination are not particularly strong ones. Zivotofsky does not assert the kind of interest, e.g., an interest in property or bodily integrity, which courts have traditionally sought to protect. See, e. g., Ingraham v. Wright, 430 U. S. 651, 673-674 (1977) (enduring commitment to legal protection of bodily integrity). Nor, importantly, does he assert an interest in vindicating a basic right of the kind that the Constitution grants to individuals and that courts traditionally have protected from invasion by the other branches of Government. And I emphasize this fact because the need for judicial action in such cases can trump the foreign policy concerns that I have mentioned. As Professor Jaffe pointed out many years ago, “Our courts would,not refuse to entertain habeas corpus to test the constitutionality of the imprisonment of an alleged Chinese agent even if it were clear that his imprisonment was closely bound up with our relations to the Chinese government.” 74 Harv, L. Rev., at 1304; see also T. Franck, Political Questions/Judicial Answers 63-64 (1992); cf. Boumediene v. Bush, 553 U. S. 723, 755 (2008).
The interest that Zivotofsky asserts, however, is akin to an ideological interest. See Brief for Petitioner 54 (citizen born in Jerusalem, unlike citizen born in Tel Aviv or Haifa, does not have the “option” to “specify or suppress the name of a country that accords with his or her ideology”); see also id., at 19 (State Department policy bars citizens born in Jerusalem “from identifying their birthplace in a manner that conforms with their convictions”). And insofar as an individual suffers an injury that is purely ideological, courts have often refused to consider the matter, leaving the injured party to look to the political branches for protection. *219 E. g., Diamond v. Charles, 476 U. S. 54, 66-67 (1986); Sierra Club v. Morton, 405 U. S. 727, 789-740 (1972). This is not to say that Zivotofsky’s claim is unimportant or that the injury is not serious or even that it is purely ideological. It is to point out that those suffering somewhat similar harms have sometimes had to look to the political branches for resolution of relevant legal issues. Cf. United States v. Richardson, 418 U. S. 166, 179 (1974); Laird v. Tatum, 408 U. S. 1, 15 (1972).
Fourth, insofar as the controversy reflects different foreign policy views among the political branches of Government, those branches have nonjudicial methods of working out their differences. Cf. Goldwater, 444 U. S., at 1002, 1004 (Rehnquist, J., joined by Burger, C. J., and Stewart and Stevens, JJ., concurring in judgment) (finding in similar fact strong reason for Judiciary not to decide treaty power question). The Executive and Legislative Branches frequently work out disagreements through ongoing contacts and relationships, involving, for example, budget authorizations, confirmation of personnel, committee hearings, and a host of more informal contacts, which, taken together, ensure that, in practice, Members of Congress as well as the President play an important role in the shaping of foreign policy. Indeed, both the Legislative Branch and the Executive Branch typically understand the need to work each with the other in order to create effective foreign policy. In that understanding, those related contacts, and the continuous foreign-policy-related relationship lie the possibility of working out the kind of disagreement we see before us. Moreover, if application of the political-question “doctrine ultimately turns, as Learned Hand put it, on ‘how importunately the occasion demands an answer,”’ Nixon, 506 U. S., at 253 (Souter, J., concurring in judgment) (quoting L. Hand, The Bill of Rights 15 (1958)), the ability of the political branches to work out their differences minimizes the need for judicial intervention here.
*220 The upshot is that this case is unusual both in its minimal need for judicial intervention and in its more serious risk that intervention will bring about “embarrassment,” show lack of “respect”. for the other branches, and potentially disrupt sound foreign policy decisionmaking. For these prudential reasons, I would hold that the political-question doctrine bars further judicial consideration of this case. And I would affirm the Court of Appeals’ similar conclusion.
’ With respect, I dissent.