## HORTON *v.* ZIMMER.

### PATENTS; INTERFERENCE; REDUCTION TO PRACTICE; ABANDONMENT.

1. Where in an interference case it appears that a patent was issued to one of the parties before the application of the other party was filed, the burden of proof is heavily upon the latter.

2. A contention made by one of the parties to an interference, that, as a record was not kept of a test of the electrical device which is the subject-matter of the interference, which test is relied upon by the other party as showing prior reduction to practice, it is not likely that the test was satisfactory, is not entitled to the consideration it would otherwise receive, where the evidence of the test is clear and satisfactory.

3. An admission by one of the parties to an interference, made at a hearing before the Examiner of Interferences, that the making and testing, by his adversary, of a device embodying the invention of the issue, on a specified date, constituted a reduction to practice, binds the party making the admission, on an appeal by him.

4. Where the testimony in an interference case shows that the reduction to practice by the junior party was earlier than the earliest date claimed by the senior party, the junior party, even though he filed his application after the issuance of a patent to the senior party, is entitled to an award of priority, unless it affirmatively appears that he abandoned the invention, or secreted it and brought it to life only after the senior party had given it to the public.

No. 501.   Patent Appeals.   Submitted November 11, 1908.   Decided December 1, 1908.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.          *Affirmed.*

The facts are stated in the opinion.

*Mr. Melville Church* and *Mr. Edwin B. H. Tower, Jr.,* for the appellant.

*Mr. Albert G. Davis, Mr. Robert H. Read,* and *Mr. Frank J. Seabolt* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

This is an appeal from three concurrent decisions of the Patent Office tribunals, and the issues are stated in the following counts:

"1. In combination, a supply circuit, a motor armature connected to said supply circuit, a motor field connected to said supply circuit, a resistence connected in said field circuit, a second resistence connected in said armature circuit, a movable member for controlling said field circuit, and a second movable member for controlling said armature circuit, said second member movable in one direction to remove the resistence controlled thereby from the armature circuit, and said first member movable in an opposite direction to insert the resistence controlled thereby in the field circuit.

"2. In combination, a supply circuit, a motor armature connected in said supply circuit, a resistence connected in said field circuit, a second resistence connected in said armature circuit, a movable member for controlling said field resistence and a second movable member for controlling armature resistence, said second member movable in one direction to remove said armature resistence from circuit and said first member movable in an opposite direction to insert said field resistence in circuit, means tending to keep said second member in its initial position, and a magnet for retaining said second member in a predetermined position.

"3. In combination, a supply circuit, a motor armature connected in said supply circuit, a motor field connected in said supply circuit, a resistence connected in said field circuit, a second resistence connected in said armature circuit, a movable member for controlling said field resistence, a second movable

member for controlling said armature resistence, said second member movable in one direction to remove said armature resistence from circuit, and said first member movable in an opposite direction to insert said field resistence in circuit, a spring tending to keep said second member in its initial position, and a magnet for retaining said second member in a predetermined position.

"4.  In combination, a movable member, a resistence controlled thereby, a second movable member, a resistence controlled thereby, a magnet to retain said second movable member in a predetermined position, means for causing said members to move together until said second member is grasped by said magnet and thereafter permitting said first member to move independently of said second member.

"5.  In combination, a movable element, a resistence controlled thereby, a second movable element, a resistence controlled thereby, means tending to keep said second movable member in its initial position, a magnet for retaining said second member in a predetermined position, and means whereby said first member will move said second member to a position to be grasped by said magnet and thereafter operate independently of said second member."

Albert J. Horton's application was filed November 2, 1904, and a patent was issued to him on June 20, 1905.  On August 22, 1904, Emerson and Dorgeloh, who were connected with the General Electric Company, the assignee of Paul H. Zimmer, filed an application for this invention, which was subsequently put into interference with the Horton patent.  The attorney for the General Electric Company subsequently determined that Zimmer, and not Emerson and Dorgeloh, was entitled to make the application, and on November 16, 1905, filed an application for Zimmer, and he was made the third party to the interference.  Thereupon Emerson and Dorgeloh conceded priority of invention to Zimmer, and the case proceeded with Horton and Zimmer as the contending parties.

A patent having issued to Horton before Zimmer's application was filed, the burden of proof is heavily upon Zimmer.

All the tribunals of the Patent Office, however, have reached the conclusion that he has overcome that burden and established his claim to priority. We have examined the record with great care, and are impelled to the same conclusion the Patent Office tribunals have successively reached. No good purpose would be subserved by a detailed discussion of the evidence in the case, and we therefore content ourselves with a general outline of the facts as they have impressed us.

It is established that early in the year 1903 Zimmer, who was employed by the General Electric Company as a skilled mechanic, and who was not only very familiar with rheostats for electric motors, but had then devised other improvements thereon, exhibited sketches substantially embodying the issue to other employees. It is established beyond question that thereafter, probably early in 1904, Zimmer personally constructed a full-sized rheostat, which is in evidence as "Exhibit C" in the case. Several witnesses testified to having seen this device while it was being tested, and that its operation was a success. Some of these witnesses are highly skilled in the art, and their testimony is clear and convincing. The point is made by Horton that it is not likely that the test of this device was satisfactory, because no record appears to have been kept of such test. If the evidence of the test was conflicting and unsatisfactory, this point would be entitled to great consideration. The evidence shows that there was some little friction between Zimmer and other employees, and it is not unlikely that the value of his discovery was minimized at that time.

About the time Zimmer constructed Exhibit C, Emerson, who was connected with the power and mining department, wrote the designing engineer of the rheostat department that a demand existed for a compound starter and regulator, with a device similar to a sketch inclosed with his letter and to be used with $\frac{1}{4}$ H. P. 230 volt motors on sensitive drills. This design was passed on to Dorgeloh, who was an electrical engineer in the rheostat department, with instructions to design a rheostat embodying the idea shown in the sketch. Dorgeloh thereupon designed a rheostat fully embodying the Zimmer Exhibit C. The

drawings were passed on to Zimmer, who built Exhibits D, E, and F, all of which embody the invention in issue. It is from these facts that Emerson and Dorgeloh based their original claim to the invention. It is contended on behalf of Zimmer that the Emerson sketches did not fully disclose this invention, but we do not deem the point of great importance, since it is very satisfactorily established that Zimmer's Exhibit C had been constructed and successfully operated before he saw Dorgeloh's drawings. Dorgeloh, who satisfactorily explains why he originally claimed to have had a part in the invention, says he had seen Zimmer's Exhibit C in operation, and discussed its features with Zimmer, prior to receiving the Emerson sketch. Four other witnesses testified to having seen this exhibit tested early in 1904. Moreover, in the opinion of the Examiner of Interferences, it is stated: "It was admitted by Horton at the hearing that the making and testing of this starter in the first week of January, 1904, constituted a reduction to practice of the issue." This admission, having been made at a hearing before a tribunal that was to pass upon the question involved in this case, bound the party making it. But, aside from this admission, we think the record clearly shows that Exhibit C did constitute a reduction to practice. Zimmer testifies that when he constructed Exhibits D, E, and F, he supposed Dorgeloh had embodied his (Zimmer's) invention in the designs.

After Zimmer's Exhibit C was tested, Zimmer, accompanied by the superintendent of his department, took it to the patent department, and left it near the desk of the patent solicitor, who was not in his office at the time. Nothing appears to have been done with this exhibit until after the declaration of interference between Emerson and Dorgeloh and Horton. Zimmer protested that he was the inventor, when he learned of the Emerson and Dorgeloh application. In preparing for that contest, the counsel for the General Electric Company discovered the facts, and concluded that a mistake had been made, and thereupon filed Zimmer's application. It appears that Zimmer at all times claimed to have been the originator of the invention. As his date of reduction to practice is earlier than the earliest

date claimed by Horton, he is entitled to priority unless it affirmatively appears that he abandoned the invention, or secreted it and brought it to light after Horton had given it to the public. Neither of these conditions is shown to have existed. Exhibit C was, for a period of several weeks, tested in a room to which the public had access. Exhibits D, E, and F, which, it must be held, embody Zimmer's invention, were also operated in such a manner as to relieve Zimmer and his assignee of the charge of suppressing the invention.

The decision of the Commissioner of Patents is affirmed, and the clerk of this court will certify this opinion and the proceedings in this court to the Commissioner of Patents, as required by law.                                    *Affirmed.*