SMITHS AMERICA CORPORATION, S. Smith & Sons (England) Ltd., Henry Hughes & Sons, Ltd., Kelvin and Hughes, Ltd., Plaintiffs,

v.

BENDIX AVIATION CORPORATION, Defendant.

Civ. A. No. 1690-52.

United States District Court District of Columbia.

Feb. 17, 1956.

48

Wm. D. Hall (of Moore & Hall), Washington, D. C., for plaintiffs.

Ralph Hudson (of Cameron, Kerkham & Sutton), Washington, D. C., for defendant.

McLAUGHLIN, District Judge.

This is a suit for patent royalties, based on a contract under seal, said contract defining "Smith" of England and "Bendix" of the United States of America as parties thereto.[1] Specifically, the agreement calls for a non-exclusive cross license, each party being licensed under the others' patents in the limited field of instruments[2] as that term is defined in paragraph one of the contract.

It is the contention of plaintiffs that during World War II both Smith and Bendix manufactured instruments for their respective governments under each others' patents in their respective countries. Plaintiffs aver that they kept defendant informed of their manufacture under Bendix patents and that they paid defendant under (and pursuant to the terms of) the contract a substantial sum based on such manufacture, but that defendant failed to pay plaintiffs' royalties due under said contract at the rate of 7½% on the selling price of an averaging sextant covered by plaintiffs' patents, made by Bendix and sold to the United States Government pursuant to Government contracts.

Defendant has raised four defenses to the suit: First, it did not use the inventions of any of the patents in suit; Second, the action is barred by the statute of limitations; Third, at least as to two patents in suit,[3] it is entitled to the benefit of a license from the owner of these patents to the United States Government; and Fourth, that under British law, a release of the averaging attachment by the British Government operated to bar any recovery by plaintiffs in this case.

The sealed instrument bears the date August 21, 1936. Plaintiffs aver that on November 1, 1944, defendant rendered a report to S. Smith & Sons, Ltd., on royalties due in the sum of $408, but failed to mention that millions of dollars worth of equipment using the patented inventions had been sold to the United States Government. On July 22, 1947, a letter was sent by a representative of defendant to a representative of S. Smith & Sons, Ltd., informing the latter that the United States Government had informed defendant that it had obtained, through the British Government, a release from S. Smith & Sons, Ltd., under

1. The parties named as plaintiffs in the caption will be designated as "Plaintiffs" throughout the memorandum, and similarly, the party named as "Defendant", except where the discussion requires the use of the individual names in the context of the memorandum. Where applicable, the singular designation "Smith" will be used as synonymous with the plural term "Plaintiffs". See quotation from introductory clause of contract, page 14 of the Memorandum.

2. The word instrument is defined in the contract to be "a recording, measuring, indicating, or similar device which may be used independently or in conjunction with other devices, but is not to be regarded as embracing a system or arrangement or combination wherein results other than recording, indicating or measuring may be obtained."

3. Those are Everitt Reissue patent No. 22,184 and Gray patent No. 2,140,579. The third patent is Everitt patent No. 2,252,341.

the Everitt U. S. patents, and that defendant had been informed that it was not to pay royalties on sextants made for the United States Government for its own use or for the use of the British Government during the period of the war. The letter also went on to state that "Under the circumstances it would seem that S. Smith & Sons should look to the British Government for compensation for use of its Everitt U. S. patents by the United States Government pursuant to the Patent Interchange Agreement between the United States and Great Britain." Plaintiffs aver that these statements were inaccurate and/or incomplete, but that in reliance on them at that time, they submitted their claim to the British Government as suggested in the letter. Plaintiffs further aver that it became clear in the latter part of 1950, that the British Government did not favor their claim. Once again correspondence on the subject of royalties was sent by plaintiffs to defendant. The matter was finally turned over to plaintiffs' attorneys in the United States, and it is plaintiffs' contention, that because of the distance involved as well as the complexity of the matter, these attorneys required considerable time to prepare and file the suit. The complaint was filed on April 16, 1952.

Defendant's averments controvert the bulk of plaintiffs' statements set forth above. Defendant avers that it received a letter dated September 23, 1947 from a representative of S. Smith & Sons, Ltd., charging that defendant was liable to plaintiffs, but that it promptly denied the charge, stating in a memorandum dated December 1, 1947 and forwarded to plaintiffs in a letter dated December 22, 1947: "Eclipse-Pioneer[4] made the Hughes-Everitt averaging

device for the United States Navy at the latter's request and in accordance with specifications and drawings furnished by the United States Navy, for the use of which the United States Government obtained permission and a release from the Government of the United Kingdom. Eclipse-Pioneer, therefore, was not obligated to accrue or pay any royalties under the Smith-Bendix agreement." Thus, defendant avers that the charge of liability having been made and denied to the full knowledge of plaintiffs, the statutory period began to run as of the receipt by plaintiffs of the memorandum which was forwarded on December 22, 1947.

From the foregoing it is clear that on the basis of the date relied upon by defendant as the date upon which the cause of action accrued, the twelve year period of limitations for a contract under seal as set forth in D.C.Code 1951, Title 12, § 201[5] would not have run at the time of the filing of the Complaint. While not denying, however, that the 1936 contract sued upon is one under seal, defendant asserts the defense of the Statute of Limitations, and, in that connection, contends that the limitation applicable to suits on a sealed contract is not pertinent because Henry Hughes & Sons, Ltd., is not a party to the contract involved in this action. Defendant argues that said contract does not cover the patents in suit since (I) defendant did not embody any invention under patents owned by plaintiffs when manufacturing sextants sold to the United States Government, and (II) even if Bendix did use such patents, it had permission to manufacture from the United States Government through a license given the latter by Henry Hughes & Sons, Ltd.[6]

4. A subsidiary of the defendant.

5. "No action shall be brought * * * on any * * * instrument under seal after twelve years after the accruing of the cause of action thereon * * *".

6. For the purpose of clarity, it is important to point out here that defendant is

contending that Henry Hughes & Sons, Ltd., was not a party to the 1936 agreement, and that if Bendix did manufacture sextants under the patents in suit, these patents were not included under the sealed contract, since they belonged to Hughes and not to Smith.

**50**

It is obvious that if the Court decides defendant to be correct under (I) above, the question of limitations becomes unimportant, since that determination would reach the very heart of the case; or, if the Court finds defendant correct under (II), as clarified in footnote six, then the suit would be barred by the statute of limitations since the patents sued on would not fall under the sealed instrument, and the period of limitations would have run on any simple contract that might have arisen between Hughes and defendant.

In the circumstances, it becomes incumbent on the Court before deciding the question of limitations, to determine the propositions as set forth in (I) and (II) above.

### Determination of Issues.

I. Does Defendant's Sextant Embody the Invention of Any of the Patents in Suit?

A. As to the Gray Patent, No. 2,140,579.

■ The essence of the Gray patent is, in the words of the inventor: "the addition of a power-driven integrating device to an octant (sextant) that let me find the celestial body once in the range of vision, get it lined up with the bubble to the best of my ability, and keep it there to the best of my ability, without taking my eye down, and do that for a period of time that was significant, and at the end of that time have an average reading appear automatically on a register on the instrument."

The inventor points out that prior to his invention it was customary to take a series of separate sights, " * * * recording each sight as taken, and finally arithmetically averaging all of the sights with the hope that several errors would oppose each other and cancel out at least to some extent." Later in the patent specification Gray describes his improvement: "The improved method and means of the present invention are based upon my conception of taking a continuous sight of a celestial body over a period of time with an octant (sextant) which is provided with an averaging device that indicates at the end of the sight the true average reading for the entire interval during which the sight is taken." In effect it is contended that the apparatus employed by Gray, in the practice of his invention, involves the adapting and bringing together of two devices: (1) a sextant capable of taking a continuous sight and, (2) an automatic averaging device. The inventor also states that the precise mechanical details of the automatic averaging device are not important, so long as the device selected can do the desired averaging automatically and without interfering with the continuous sight afforded by the sextant.

Defendant argues that claims of the Gray patent call for automatic integration, and in that connection states, in effect, that the Bendix sextant does not perform an integrating function, but a function more properly termed "averaging". But there is evidence that the Bendix sextant is built according to Twiney and Thomas British patent No. 590,164. That patent in line 9, calls its mechanism an "automatic integrating" one, which are the exact words used in Claims 8, 9, and 12 of the Gray patent in suit. This fact was confirmed by the testimony of an expert witness of defendant. In addition, both the Gray patent and Bendix sextant have the following structural and operational similarities: (1) both have an octant (sextant) for continuous sighting; (2) both have an automatic averaging device; (3) both have a control knob geared to the averaging device; (4) both employ a clockwork drive; (5) in both, a clockwork drives a disc; (6) in both there is a second disc driven forward by the first one to an extent depending on movement of the control knob of the sextant; (7) both have an indicator or register coupled to the second disc; and (8) both average above a baseline. Defendant has also set forth the argument that prior to Gray's

invention, three French (Le Petit) patents disclosed the combination of a sextant permitting a continuous sight and a mechanism affording an indication of average altitude. But from a consideration of the testimony, the Court is not persuaded that these patents disclose a sextant with an averaging device; rather the Court concludes that they teach a curve drawing device.

### B. As to the Everitt Patent No. 2,252,341.

This patent teaches that in an averaging sextant it is desirable to locate a shutter normally outside of the line of vision in combination with a counter which, at the end of a predetermined number of shots or measurements, releases the shutter and enables it to be moved into the line of vision by means of a spring which is provided. This advises the pilot or navigator that the sextant has completed its computation whereby the register now shows the average altitude desired.

Claim 9 of this patent reads:

"In an observation device the combination of a frame, means supported on said frame for making an observation measurement, a register supported on said frame controlled by said means for indicating the numerical average of a series of predetermined number of said measurements * * * a member movably supported on said frame and controlled by said means for making observations to move automatically into a position to prevent further observation measurements from being made after said series of measurements has been made and means for resetting said member to another position to permit another series of measurements to be made."

The Bendix sextant has a register on it, on which appears the averaged altitude of the predetermined number of samplings; there is a shutter that is normally held outside the line of vision; and there is a geneva wheel which may be called a counter and which counts the samplings, and which, when the last sample has been taken, releases the shutter so that it is moved into the line of vision by a spring.

Defendant, in regard to Claim 12 of this patent, states that the shutter is "operated by" observation measurements; but it appears that the claim itself states that the shutter is "operated by and in response to the completion of said series of measurements." It is the completion of the series, not the measurements themselves, to which the shutter is responsive. In both the Bendix sextant and this Everitt patent, the mechanical construction necessarily requires completion of a predetermined number of measurements before the shutter can operate.

### C. As to the Everitt Reissue Patent No. 22,184.

This patent, as stated by plaintiffs, is the first patent ever issued for an averaging device and it is not concerned with the concepts of Gray (i. e. continuous sight plus automatic averaging), nor is it concerned with the novel structure of Everitt No. 2,252,341 (counting device plus shutter). Claim one of the patent reads:

"An instrument, such as a sextant having a micrometer screw adjustment and a totalizing counting mechanism driven therefrom and arranged to show a reading proportional to that of the sextant and micrometer head in inverse ratio to a predetermined number of readings to be averaged whereby the counting mechanism indicates directly the average value of the readings after the predetermined number of readings has been made."

The Bendix instrument is a sextant, and contains a micrometer screw adjustment consisting of a control knob. The Bendix sextant also contains a totalizing counting mechanism consisting of an averaging device and a register, and the totalizing mechanism of

the Bendix sextant is driven (i. e. controlled) by the control knob. Also, the predetermined number of readings in the case of the Bendix device is sixty, and the totalizing counting mechanism is arranged so that it does show a reading in inverse ratio to a predetermined number of readings to be averaged. The Everitt patent, as above quoted, calls for the requirement whereby the counting mechanism indicates directly the average value of the readings after the predetermined number of readings has been made. In the Bendix device the register indicates directly the average value of the readings after the predetermined number of readings has been made.

Claim 14 of this patent calls for "a device for measuring the average altitude of a celestial body comprising an observation instrument having a movable optical element for making a measurement, fine adjustment means for moving said optical element, a register on said instrument and mechanism connecting said fine adjustment means and said register for transmitting movement of said fine adjustment means effected during measurements of said altitude to said register to give a numerical average of the measurements taken by said observation instrument." Expert testimony clearly established that the Bendix sextant was such a device as is set out in Claim 14 and contained parts similar thereto.

On the basis of the evidence above referred to the Court is of the opinion that the claims recited in the three patents just discussed clearly read on the Bendix sextant.

D.  As to Estoppel by Marking and as to Admissions.

██  Defendant admits that over a prolonged period of time it marked its instruments with plaintiffs' patent numbers. Plaintiffs contend that such marking of their patent numbers on the

Bendix sextant estops defendant to deny that it made use of plaintiffs' patents.

Defendant takes issue with plaintiffs' contention, and states that five different patent numbers (including plaintiffs'), were grouped together with the word "Pending" on the name plate of the Bendix sextant, under the phrase "One or More".[7] Defendant avers that by its use of the term "One or More" it avoided any indication that the Bendix sextant was manufactured under patents held by plaintiffs, and cites as main authority for its position the case of Kenyon v. Automatic Instrument Co., D.C. W.D.Mich., 89 F.Supp. 602, affirmed 6 Cir., 186 F.2d 752, 755, certiorari denied 342 U.S. 820, 72 S.Ct. 37, 96 L.Ed. 620. Examination and consideration of that decision, however, leads the Court to conclude that it is not controlling in the present controversy. In the Kenyon case, action was brought against the assignee of one licensed under a patent, to recover royalties allegedly due from the manufacture of phonographs under such patent. The patent notice on the manufactured articles contained plaintiff's (Kenyon) patent number. Evidence was adduced that tools, dies and jigs for manufacture of phonographs under the patent were scrapped by the assignee of the licensee; that entirely new machine tools were set up; that entirely new devices were manufactured; and that no claim for royalties was made for a period of approximately eight years after the manufacture of the new devices had begun. In affirming the decision of the Trial Court, the Court of Appeals stated in part:

"It is urged that the patent notice estops appellee from raising the defense claimed here. The notice lists 14 patents under the following statement: 'This device is manufactured under one or more of the following patents * * *.' * * * Various cases are cited in which the existence of a patent notice, together with other circumstances, was

7.  The full term is: "Manufactured Under One Or More Of The Following Patents."

held to have bearing upon the question of liability for royalties. Cf. Harley C. Loney Co. v. Perfect Equipment Corp., 7 Cir., 178 F.2d 165; Kant-Skore Piston Co. v. Sinclair Mfg. Corp., 6 Cir., 32 F.2d 882; Collis Co. v. Consolidated Machine Tool Corp., 8 Cir., 41 F.2d 641, 645.

"We think these decisions are not controlling in the factual situation here presented. In each of the cited cases the identical, or substantially the same tool was manufactured during the period for which royalties were claimed. * * * Here, in 1933, the tools, dies, and jigs for manufacture under the Kenyon patent were scrapped, entirely new machine tools were set up and entirely new devices were manufactured. No royalties were paid thereafter. * * * At any rate on February 10, 1934, Kenyon wrote to the appellee and expressed his interest in 'the new line of phonographs,' and in a possible declaration of dividends, but raised no claim for royalties until 1941."

The Court determined that "the inclusion of the patent number in a somewhat meaningless patent notice does not change the situation. Certainly the interpretation of the parties, including Kenyon, gives force to this conclusion."

Since the facts and circumstances in the Kenyon case appear so entirely different from those in the present action, no additional discussion is deemed necessary on the part of this Court to further distinguish that case from the instant one. The Court concludes, therefore, that Kenyon v. Automatic Instrument Co., supra, does not support defendant in its contention, under the facts and circumstances of this case, that the marking of the Bendix sextant in the manner above described does not estop it to deny its use of plaintiffs' patents.

Taking into account the patent markings in the instant case and the facts and circumstances surrounding same, the Court is of the opinion that defendant is estopped to deny that it used plaintiffs' patents. Harley C. Long v. Perfect Equipment Corp., 7 Cir., 178 F.2d 165; Collis Co. v. Consolidated Machine Tool Corporation, 8 Cir., 41 F.2d 641, certiorari denied 282 U.S. 886, 51 S.Ct. 90, 75 L.Ed. 781; Kant-Skore Piston Co. v. Sinclair Mfg. Corporation, 6 Cir., 32 F.2d 882; Dwight & Lloyd S. Co. v. American Ore Reclamation Co., D.C.S.D.N.Y., 44 F.Supp. 401. Cf. also, Bucky v. Sebo, 2 Cir., 208 F.2d 304; United States v. General Electric Co., D.C.N.J., 82 F.Supp. 753, modified, D.C., 115 F.Supp. 835.

Plaintiffs rely upon the additional ground of admissions by defendant of the use of the patents in question, pointing out that defendant in its original answer stated: "defendant * * * admits that it has manufactured and sold instruments in the Marine and Aviation fields embodying the inventions of one or more of said patents * * *." While this Court does not look upon such an admission as conclusive, it nevertheless regards it as persuasive material. See Berry v. Littlefield, Alvord & Co., 54 App.D.C. 195, 296 F. 285; Ball v. Barnhurst, 50 App.D.C. 257, 270 F. 693; Horton v. Zimmer, 32 App.D.C. 217. Defendant calls attention to the fact that it withdrew the admission in a subsequent pleading. However, in Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, 2 Cir., 32 F.2d 195, 198, the Court held:

"A pleading prepared by an attorney is an admission by one presumptively authorized to speak for his principal. (Citing cases.)

"A further objection was based upon the fact that the complaint had been superseded by an amended pleading. This objection is likewise unavailing. When a pleading is amended or withdrawn, the superseded portion ceases to be a conclusive judicial admission; but it still remains as a statement once seriously made by an authorized

agent, and as such it is competent evidence of the facts stated * * *."

Furthermore, there is considerable documentary evidence showing admissions on the part of defendant's officers or agents to the effect that defendant's sextant embodied plaintiffs' patents.

Defendant, in its defense to the claim asserted against it by plaintiffs that defendant used inventions of plaintiffs covered by the patents in question, has relied heavily on the doctrine of File Wrapper Estoppel. But the Court is of the opinion that no question of File Wrapper Estoppel arises unless it can be shown that it is necessary to go beyond the ordinary and accepted meaning of the words in the allowed claims, and not even then unless it can be shown that plaintiffs must resort to the doctrine of equivalents. Therefore, since the Court has determined, as stated above, that the claims in plaintiffs' patents read directly on defendant's sextant, it is unnecessary for plaintiffs to resort to the doctrine of equivalents. Thus the authorities cited by defendant under its defense of File Wrapper Estoppel have no applicability in this case. See and Cf. Lewis v. Avco Mfg. Corp., 7 Cir., 228 F.2d 919; Keith v. Charles E. Hires Co., 2 Cir., 116 F.2d 46; Southern Textile Machinery Co. v. United Hosiery M. Corp., 6 Cir., 33 F.2d 862; R. Hoe & Co. v. Goss Printing Press Co., 2 Cir., 30 F.2d 271.

II. Is Defendant Entitled to the Benefit of a Royalty Free License from Hughes to the United States Government on Everitt Reissue Patent No. 22,184 and Gray Patent No. 2,140,579?

Defendant has raised the defense that it is entitled to the benefit of a royalty free license from the owner of the patents, Hughes, to the United States Government on Everitt Reissue Patent No. 22,184, and Gray Patent No. 2,140,579. As of July 12, 1938, thirteen claims had been allowed, on Everitt Patent No. 2,145,347 (subsequently reissued as Everitt Reissue Patent No. 22,184). Each claim constituted a separate invention. See Leeds & Catlin Co. v. Victor Talking Mach. Co., 213 U.S. 301, 29 S.Ct. 495, 53 L.Ed. 805. Prior to the granting of the license, the examiner had declared an interference (involving the same two claims, i. e. numbers 2 and 13, contained in the license)[8] between Everitt and Thurlow, an officer of the United States Army. This adjudication held that these two of Everitt's thirteen claims read on the Thurlow application.[9] The license, therefore, was limited solely to the two claims involved in the interference. It is clear that the Government could then have used Thurlow's device without infringing any other claims of the Everitt application. Consequently, since the license did not extend to the other claims, the Court must conclude that Defendant, if operating under claims 2 and 13 (as set forth in footnote 8), was not licensed under the claims involved in this suit. (See discussion under I, A, B, and C, supra.) Nor was Defendant, by virtue of the license, authorized to make use of the Gray patent.

8. The claims read as follows:

"A measuring instrument having a stop constituting a reference point, a totalising mechanism, and means operative only when the instrument is moved forward from said reference point to a reading for driving said totalising mechanism at a reduction ratio equal to the reciprocal of a predetermined number of measurements to be averaged."

"In a device for averaging a plurality of measurements, the combination of means adjustable in accordance with each measurement, mechanism for successively indicating a predetermined fractional increment of said measurement for each adjustment of said means, and an indicator actuated successively by said mechanism in accordance with said increments for indicating the arithmetical means of a predetermined number of said increments."

9. It was in settlement of the interference proceeding, mentioned above, that the license was granted by Hughes to the United States Government.

At the time the license was given, Gray owned his patent and the Government received no right to use it by virtue of Hughes' license. Again, the Gray patent claimed a sextant taking a continuous sight over a period of time and containing means automatically integrating measurements. The licensed claims of Everitt Reissue patent No. 22,184 (i. e. Claims 2 and 13) include neither of these elements.[10]

Defendant cites several cases for the proposition that a patent owner cannot sell his rights to another and deprive his prior assignees of the benefit of the assignment by subsequently acquiring another allegedly dominating patent. These cases, however, relate to licenses authorizing manufacture or sale of a machine or article of stipulated construction. The Court agrees with the rule announced in these cases so far as it relates to such licenses. However, the Court is of the opinion that they are not applicable to the facts in the case at bar. As set out in plaintiffs' example, they would be applicable in the event Hughes should grant the United States Government a license to make "Type 3014 Sextant", under Everitt Reissue Patent No. 22,184 as the licensed patent. If, later, Hughes should sue the Government, asserting that two additional patents applied, an estoppel might arise. (This assumes, of course, that the Government had been misled by the transaction.) Here, however, as previously stated, the license was granted under two claims only, without specifying a particular licensed article. Cf. United Printing Machinery Co. v. Cross Paper Feeder Co., D.C.Mass., 220 F 322; Lukens Steel Co. v. American Locomotive Co., D.C.N.D.N.Y., 99 F.Supp. 442, affirmed 2 Cir., 197 F.2d 939.

It follows, therefore, that defendant is not entitled to the benefit of a royalty free license from Hughes to the United States Government, since that license did not cover any of the claims in this suit.

### III. The Statute of Limitations. Was Henry Hughes and Sons, Ltd., a Party to the Sealed Contract?

As stated by the Court, supra, before defendant's defense of the statute of limitations could be considered, it was necessary to determine whether or not defendant embodied any invention of patents owned by plaintiffs, when manufacturing sextants sold to the United States Government, or whether Hughes granted a license under which defendant could have made use of these patents, royalty free. These questions, the Court has answered. Now it becomes essential to determine whether or not Henry Hughes & Sons, Ltd., was a party to the sealed contract of August 21, 1936, the instrument on which plaintiffs base their demand, for if it were not a party thereto, as defendant claims, then the statutory period of limitations relating to the time within which an action on a sealed instrument might be instituted would not be applicable, and plaintiffs' rights would be correspondingly affected.

The introductory clause of the contract states that the contract is made: " * * * by and between S. Smith & Sons * * * for itself and its subsidiary Companies, including Messrs. Hughes & Sons Limited (all hereinafter called 'Smith'), Party of the One Part, and Bendix Aviation Corporation * * * and its subsidiary companies, including Pioneer Instrument Company, Inc. * * * (all hereinafter referred to as "Bendix"), Parties of the other Part * * * "

The Court is of the opinion that no plainer language could have been utilized to express the fact that Henry Hughes & Sons, Ltd., was contemplated as a party to the contract. The contention of the defendant that Hughes & Sons, Ltd., was not a party signatory appears

10. Clearly, the license did not extend to Everitt Patent No. 2,252,341. This patent recites a shutter and counter for releasing the shutter. Neither of these elements is recited in the original Everitt application.

to the Court to contradict the clear language in the instrument. Several representatives of S. Smith & Sons, Ltd., signed the agreement, and in the words of the contract itself it was made "between S. Smith & Sons * * * for itself and its subsidiary Companies, including Messrs. Hughes & Sons Limited."

The question has arisen, however, as to whether or not S. Smith & Sons, Ltd., had authority to sign on behalf of the Hughes Company. Plaintiffs have presented evidence to show that at all times during the life of the agreement S. Smith & Sons, Ltd., held a majority of the stock in the Hughes Company; had always had the right to appoint the majority of the Hughes board of directors; and that although these are separate boards, each acts within a broad confine of policy laid down by the parent board of Smith. Nor is evidence lacking that defendant recognized Hughes as a party to the contract. Some examples follow: In a stipulation entered into between the parties prior to the trial of this case, defendant agreed that " * * * it is understood that the word 'Smith' is defined to include the plural, where applicable, and to include all subsidiaries and successors in interest." A letter was introduced from a representative of the Bendix subsidiary, Pioneer Instrument Company, to Hughes, dated December 4, 1936, reading in part: "It was with great pleasure that I learned of the completion of negotiations between your company and our organization. I am looking forward to very interesting contact with you in the future on navigational equipment * * *."; in a letter dated December 26, 1944, from the patent counsel for the eastern division of the Bendix Aviation Corporation to an officer of the United States Army, it was stated in part: "The three Everitt patents relate to an averaging sextant and are already licensed to Bendix Aviation Corporation by virtue of an agreement dated August 21, 1936 with S. Smith & Sons, Ltd., * * * and its subsidiary companies, including Hughes & Sons, Ltd., * * *." And in his pretrial deposition this same officer of Bendix stated that Hughes was made a party to the contract because it wished to interest Pioneer in its sextant. The Court concludes that S. Smith and Sons, Ltd., did have authority to sign on behalf of the Hughes Company.

It follows, therefore, that Henry Hughes and Sons, Ltd., being a party to the sealed contract, the twelve year limitations period applies,[11] and the action is not barred by the Statute.

### IV. Defendant's Fourth and Final Defense.

As a final defense defendant asserts, that under certain British defense regulations, which were set forth at trial, the British Government, acting through its agents, granted a release to the United States Government of plaintiffs' averaging device, with permission to manufacture and use it on a sextant without payment of royalties. Bendix was chosen as manufacturer.

Plaintiffs argue that these regulations cannot be construed in such a way as to affect the contract in suit. Learned and distinguished counsel from the United Kingdom, testifying on behalf of both parties, gave clear and scholarly opinions as to the proper interpretation of these regulations. It is unnecessary, however, in the circumstances for the Court to consider the question, raised by the defendant, as to the proper interpretation of the British regulations. During the trial of the case, defendant, over the objection of plaintiffs, offered in evidence a certificate containing a series of letters from high ranking officers of the British Armed Forces to the United States Navy. One of these letters, dated August 26, 1941, is to the effect that if the Navy desired a release of a sextant, designated as Mark IX-A, or any part thereof, a formal letter of

---

11. Footnote 5, supra.

release covering the reservation of commercial rights, preservation of secrecy in manufacturing, and so forth, would be issued before any manufacture proceed.

In a subsequent letter, dated November 10, 1941, the release was given, the letter reading: "Forwarded herewith is one set of drawings for the automatic averaging attachment of the Mark IX-A sextant." Defendant, however, was unable to produce the drawings. It was plaintiffs' contention that since the drawings were not produced, the scope of the release could not be determined, hence the letters were inadmissible. Defendant argued that in the first letter of August 26, 1941, in the first paragraph, there is reference to the "Mark IX-A sextant, which was forwarded to you originally on the 31st of July, and returned to this office on August 18th, and again sent to you on August 20th." Defendant took the position that this was a reference to an actual instrument, three months prior to the letter of November 10, 1941, and hence, constituted a far better release than any set of drawings, since the instrument was present.

Plaintiffs, however, pointed out that no request was made for a release of the whole sextant, and that the letter of November 10, 1941, did not purport to release the whole sextant, but simply purported to release the automatic averaging device. To this plaintiffs added, that the shutter (Everitt patent No. 2,252,341) which was part of that sextant, for example, would not be part of the averaging device merely because it was part of the sextant.

The Court considers to be significant in connection with a consideration of the matter of the release and its contents, particularly in regard to the drawings, the following request for admission submitted by plaintiffs to defendant, and defendant's answer thereto:

"There was no drawing accompanying the alleged Hill letter of November 10, 1941, showing a shutter for obscuring vision through a sextant after the last of a series of shots."

"Answer: Admitted. The Hill letter of November 10, 1941 was sent to the United States Navy and Defendant does not have the drawing forwarded therewith. The defendant obtained from the British Ministry of Supply a copy of drawing No. GA 50159/43000 entitled 'complete arrangement automatic attachment Sextant IX-A.' bearing issue date of July 1941, and alteration dates up to 21 August 1944. This drawing shows clock-driven mechanism for operating a shutter at the end of a predetermined period of time, but no shutter operable after the last of a series of shots, as stated in the request."

Plaintiffs contended that if a request had been made for the shutter, the British would have denied such request since this was not a part of the sextant which the Government had improved through the Royal Aircraft Establishment. Therefore, plaintiffs argued that the release would necessarily have been limited in nature, and since the drawings which defined the scope of the release were not produced, it could not be determined just what had been released.

In addition to the foregoing argument with respect to the effect of the letter of August 26, 1941, and its reference to the Mark IX-A sextant, defendant makes the further contention that when the entire correspondence is considered it is manifest that the "drawings, data, and manufacturing information" released by the letter of November 10, 1941, related to the Mark IX-A sextant, and constituted a release thereof.

The Court, however, is not persuaded that the above quoted words, as contended by defendant, refer to the sextant itself. Rather in the circumstances, it appears reasonable to the Court, as stated during the course of the trial, that the release is contained in the letter of November 10, 1941, and the drawings referred to in that letter are an

essential part of such release. The Court, after due consideration, ruled that the letter of November 10, 1941, was not admissible for the reason that the drawings constituting, as above stated, an essential part of the release, were not produced and were not made a part of the record. The Court felt then, as it does now, that any evaluation of the release referred to in the letter without the drawings would be meaningless. It follows, therefore, that defendant's fourth defense falls.

One other question must be disposed of at this point. Defendant, at the trial, stated that there had been an interchange of diplomatic correspondence between the State Department and the British Foreign Office which began in December of 1953, as to the validity of the letters of August 26 and November 10, 1941, and as to whether or not they were effective as an agreement between the two governments. Defendant contended that if they were so effective, it would clearly be a question of a political nature. Defendant argued further, that there is a continuing diplomatic controversy on the subject between the government of the United States and Great Britain, and that the validity of the release, therefore, is a matter for political rather than judicial determination

Defendant, in support of its contention, relies on the case of Z. & F. Assets Realization Corporation v. Hull, 72 App. D.C. 234, 114 F.2d 464, affirmed 311 U.S. 470, 61 S.Ct. 351, 357, 85 L.Ed. 288. In that case a Mixed Claims Commission, consisting of American and German members, was set up pursuant to an agreement between this country and Germany, the agreement empowering the Commission to hold hearings and to determine the amount to be paid by Germany in satisfaction of Germany's financial obligations under two treaties previously made between the two countries. Subsequently awards were made and certified by the Secretary of State to the Secretary of the Treasury pursuant to the War Claims Act of 1928. A declaratory judgment was then sought by the petitioner to declare the awards null and void and to enjoin the Secretary of State from certifying the awards and the Secretary of the Treasury from paying them. The Supreme Court, in its determination, held that the validity of the awards was political in nature, and not an appropriate question for judicial determination.

This Court is of the opinion that the facts as set forth in the case above are clearly distinguishable from those in the instant case. Here, no international commission has been set up to determine the rights of these parties, nor are plaintiffs challenging an award made by any such body, and in doing so, questioning the acts of the Secretary of State or the Secretary of the Treasury.

At one point in his Concurring Opinion, Mr. Justice Black said:

"Nowhere in the Act is there any language which either expressly or by fair implication indicates a purpose of Congress to permit some claimants to resort to the courts— as petitioners here have done—to determine the propriety of awards by the Mixed Claims Commission to other claimants."

And earlier, in the Opinion of the Court it was stated:

"Petitioners must claim solely by virtue of their interest in the fund created by the statute and under its terms they are not entitled to complain of payments out of that fund of awards which the Secretary of State has certified."

In the present case, there is no Act of Congress directing what shall be done under facts similar to those in this action, and plaintiffs are not dependent for the enforcement of their claims on the awards of any international commission, or the payment of such award out of a fund set up by Act of Congress. Plaintiffs' claims in this action are based on a contract under seal between them-

selves and defendant. While the Court recognizes that the Executive Department has jurisdiction in purely political matters, the Court is also aware that when private property rights are in issue the Courts rather than the Executive Department have jurisdiction. As was stated by the Court in Banco de Espana v. Federal Reserve Bank, 2 Cir., 114 F.2d 438, 442:

"The courts will leave for the executive the determination of all 'political' issues; in the international field this means such matters as the recognition of new governments or the making of treaties, not the direct determination of questions of property."

Citing for comparison, Doe ex dem. Clark v. Braden, 16 How. 635, 57 U.S. 635, 14 L.Ed. 1090; Z. & F. Assets Realization Corp. v. Hull, 72 App.D.C. 234, 114 F.2d 464; Field, The Doctrine of Political Questions in the Federal Courts, 8 Minn:L.Rev. 485; Jaffe, Judicial Aspects of Foreign Relations (1933) pp. 8–78.[12] And in Sullivan v. State of Sao Paulo, 2 Cir., 122 F.2d 355, 358, the Court held that:

"The adjudication of present rights to property within a court's jurisdiction is, however, a purely judicial function, which no Executive department of the Government is constitutionally or practically equipped to discharge."[13]

Under the circumstances of the instant case it is the Court's conclusion that private property rights alone are involved, and, consequently that the Court has jurisdiction over the controversy.

### Conclusion.

The Court concludes, therefore, that defendant, in the manufacture of the Bendix sextant for the United States Government, embodied inventions covered by patents in suit owned by plaintiffs, and that defendant is liable to plaintiffs under the sealed contract of August 21, 1936, for royalties due under the terms of that agreement.

Counsel for plaintiffs will prepare appropriate findings of fact, conclusions of law and order.

12. For a further general treatment of the problem of political questions, cf. also Vermilya-Brown Co. v. Connell, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76, rehearing denied 336 U.S. 928, 69 S.Ct. 652, 93 L.Ed. 1089; Chicago & S. Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568; United States v. State of California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889, rehearing denied 332 U.S. 787, 68 S.Ct. 37, 92 L.Ed. 370, opinion supplemented 332 U.S. 804, 68 S.Ct. 20, 92 L.Ed. 382; Clark v. Allen, 331 U.S. 503, 67 S.Ct. 1431, 91 L.Ed. 1633; United Public Workers, etc. v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754; Ex parte Sawyer, 124 U.S. 200, 8 S.Ct. 482, 31 L.Ed. 402; Sevilla v. Elizalde, 72 App.D.C. 108, 112 F.2d 29; Burlingham v. United States, 8 Cir., 34 F.2d 881.

13. See also 3 Willoughby, Constitutional Law, 2nd Ed., Chap. 73, page 1336 under political questions, where it is said: "Courts will exercise jurisdiction where property rights are involved."